The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 24, 2019

## 2019COA161

**No. 17CA0558, *People v. Dyer* — Constitutional Law — Fourth Amendment — Searches and Seizures — Warrantless Search; Dependency and Neglect — Action Upon Report of Intrafamilial, Institutional, or Third-party Abuse**

A division of the court of appeals considers whether Department of Human Services caseworkers are subject to the Fourth Amendment.  The division concludes that they are.  The division further concludes that the caseworkers' warrantless entry in this case was illegal and required suppression of all evidence obtained as a direct result of that illegal entry, notwithstanding any exceptions to the Fourth Amendment's warrant requirement and the exclusionary rule that were not raised and ruled upon by the trial court.  Because the trial court failed to suppress this evidence, the division reverses and remands for a new trial.

COLORADO COURT OF APPEALS                                    **2019COA161**

Court of Appeals No. 17CA0558
Larimer County District Court No. 14CR1120
Honorable Gregory M. Lammons, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Leah Sue Dyer,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE PAWAR
Dailey and Terry, JJ., concur

Announced October 24, 2019

Philip J. Weiser, Attorney General, Frank R. Lawson, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Matthew Fredrickson, Alternate Defense Counsel, Lakewood, Colorado, for
Defendant-Appellant

¶ 1     Department of Human Services (DHS) caseworkers entered the home of defendant, Leah Sue Dyer, without a warrant. We hold, as an issue of first impression in Colorado, that DHS caseworkers are subject to the Fourth Amendment. We further hold that the caseworkers' warrantless entry in this case was illegal, and therefore the trial court was required to suppress all evidence obtained as a direct result. Because the trial court failed to suppress this evidence, we reverse Dyer's conviction of first degree child abuse resulting in serious bodily injury and remand for a new trial.

## I.  Background

¶ 2     Dyer's mother called the DHS and alleged that Dyer was neglecting her seven-year-old daughter, S.D., who suffered from a seizure disorder. DHS caseworkers tried to contact Dyer and her daughter at their home but were unsuccessful. The caseworkers then sought and received an order to investigate under section 19-3-308(3)(b), C.R.S. 2019. They did not obtain a search warrant under section 19-1-112(1), C.R.S. 2019.

¶ 3     Over the next several days, the caseworkers, accompanied by police officers, repeatedly tried to contact Dyer and her daughter at

1

their home, again without success. On the third day, police officers went to Dyer's home without the caseworkers. They knocked on the door and Dyer answered. The officers informed Dyer of the order to investigate. Though the order did not authorize their entry without Dyer's consent, they told her that they needed to come inside to check on S.D. When her initial objections did not cause law enforcement to leave, Dyer eventually stepped aside and the officers entered the home.

¶ 4 Once inside, the officers inspected the home, spoke to both Dyer and her husband, and contacted the caseworkers to let them know that they had gained entry to the home. The officers also observed S.D. experience what appeared to be a seizure and requested an ambulance.

¶ 5 After the apparent seizure ended, the caseworkers and paramedics arrived at and entered the home. The caseworkers inspected the home and talked to Dyer and her husband while the paramedics tended to S.D. Without Dyer's or her husband's permission, the paramedics loaded S.D. into an ambulance and took her to the hospital. Dyer requested but was not permitted to ride in the ambulance with her daughter, so she and her husband

drove themselves. The caseworkers and police officers also drove to the hospital.

¶ 6        At the hospital, S.D. was taken to the emergency department, and Dyer was again denied access to her. Before she was allowed to see her daughter,[1] a police officer asked Dyer if she would participate in an interview. Dyer agreed to the interview, and it was conducted by a police officer and a caseworker in a makeshift private room at the hospital. Months later, Dyer gave another statement to police about many of the same topics covered in the hospital interview.

¶ 7        The prosecution charged Dyer and her husband with child abuse and, over Dyer's objection, jointly tried them. The prosecution alleged that Dyer and her husband had engaged in a pattern of conduct that allowed S.D.'s condition to deteriorate to a point where she was severely underweight, had stopped talking and feeding herself, and was unable to go to the bathroom by herself.

---

[1] The evidence was conflicting as to who restricted Dyer's access to S.D. at the hospital. The trial court was not, however, persuaded that it was the police or caseworkers who were responsible for this.

¶ 8 Before trial, Dyer moved to suppress much of the evidence obtained by police, caseworkers, and paramedics on the day they came to her home and took S.D. to the hospital. Dyer argued that the officers, caseworkers, and paramedics had entered her home illegally. She sought to suppress all evidence obtained as a direct result of that illegal entry. Alternatively, she argued that all of her statements to officers, caseworkers, and doctors that day should be suppressed because they were unwarned custodial statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were also involuntary.

¶ 9 The trial court ruled that the officers' initial entry into Dyer's home was illegal and therefore suppressed the officers' observations from inside the home. The court next found, however, that the caseworkers' and paramedics' entries were legal and admitted their observations from inside the home. The court also admitted Dyer's interview with the officer and caseworker at the hospital, as well as her later police interview, holding that these statements were noncustodial and voluntary.

¶ 10     The jury found Dyer guilty of child abuse.  The trial court entered a judgment of conviction and sentenced her to fifteen years in the custody of the Department of Corrections.

¶ 11     Dyer appeals.  She argues that the trial court erred by (1) failing to suppress the caseworkers' and paramedics' observations from inside her home, and her interview at the hospital; (2) denying her motion to sever her case from her husband's; (3) failing to give several jury instructions; and (4) admitting other evidence.

¶ 12     We agree with Dyer's first contention that the trial court erred by failing to suppress the caseworkers' and paramedics' observations from inside her home and the statement she gave at the hospital to the authorities.  We also conclude that this error requires reversal.  We therefore address her additional alleged errors only to the extent that they are likely to recur on retrial.

II.  Officers' and Caseworkers' Illegal Entries Require Reversal

¶ 13　　Dyer argues that the trial court erred by failing to suppress the caseworkers' and paramedics' observations from inside her home[2] and the statements she made at the hospital.  We agree.

¶ 14　　Reviewing a trial court's suppression ruling presents a mixed question of fact and law.  *See People v. Hyde*, 2017 CO 24, ¶ 9.  We defer to the trial court's factual findings if they are supported by the record and review the court's legal conclusions de novo.  *Id.*

### A.  Governing Law

¶ 15　　The Fourth Amendment provides that individuals shall be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  A warrantless search of a person's home is presumptively unreasonable and therefore illegal.  *See People v. Fuerst*, 2013 CO 28, ¶ 11.  The prosecution can overcome this presumption only by establishing that the search falls within a recognized exception to the warrant requirement.  *Id.*

¶ 16　　Although the Fourth Amendment outlaws unreasonable searches and seizures, nothing in the text of the Fourth

---

[2] For purposes of our analysis, the caseworkers' and paramedics' "observations" from inside Dyer's home means all the information they gathered from inside.  This includes not only what they saw, but also all statements made to them.

Amendment requires suppression of illegally obtained evidence. Instead, the exclusionary rule, a judicially created evidentiary rule, gives effect to the Fourth Amendment by requiring suppression of any evidence obtained as a direct result of an illegal search or seizure. *See People v. Kazmierski*, 25 P.3d 1207, 1213 (Colo. 2001); *People v. Rodriguez*, 945 P.2d 1351, 1363 (Colo. 1997). Whether evidence was obtained as a direct result of an illegal search or seizure depends on whether the evidence was obtained by exploiting the illegality or instead by "means sufficiently distinguishable to be purged of the primary taint" of the illegality. *Rodriguez*, 945 P.2d at 1363-64 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

¶ 17    If a trial court erroneously admits evidence in violation of the Fourth Amendment and the exclusionary rule, we must reverse unless the error was harmless beyond a reasonable doubt. *See People v. Morehead*, 2015 COA 131, ¶ 34, *aff'd in part and rev'd in part on other grounds*, 2019 CO 48. This standard compels the prosecution to prove that the error does not require reversal. *Id.* at ¶ 35.

B.  The Caseworkers' Entry into Dyer's House Was Illegal

7

¶ 18      Neither party disputes that the officers' entry was illegal because it was warrantless and without consent.  The caseworkers' entry was also warrantless and without consent.  Despite this fact, the trial court ruled that the caseworkers' entry was legal because they were not acting as agents of the police.  This ruling was error.

¶ 19      Whether the caseworkers were acting as agents of the police is irrelevant for Fourth Amendment purposes.  Even if they were not acting as agents of the police, the caseworkers were governmental officials and were therefore subject to the Fourth Amendment's restrictions.

¶ 20      Although the Fourth Amendment and the exclusionary rule are most often applied to the actions of police officers, the United States Supreme Court has made clear that "[t]he basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by *governmental officials.*"  *New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) (emphasis added) (quoting *Camara v. Mun. Court*, 387 U.S. 523, 528 (1967)).  The Fourth Amendment therefore applies to any governmental official.  Whether the governmental official is a police officer conducting a criminal investigation or a caseworker conducting a

civil child welfare investigation does not matter. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1205 (10th Cir. 2003) ("[T]he defendants' contention that the Fourth Amendment does not apply in the 'noncriminal' and 'noninvestigatory' context is without foundation.").

¶ 21 As the Tenth Circuit has put it, "[t]he Fourth Amendment protects the right of the people to be 'secure in their persons' from government intrusion, whether the threat to privacy arises from a policeman or a Head Start administrator. There is no 'social worker' exception to the Fourth Amendment." *Id.* Other courts agree. *See Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 420 (5th Cir. 2008) ("[I]t is well established in this circuit that the Fourth Amendment regulates social workers' civil investigations."); *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) ("[T]he strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees."); *State in Interest of A.R.*, 937 P.2d 1037, 1040 (Utah Ct. App. 1997) ("[T]he Fourth Amendment's prohibition on unreasonable searches and seizures applies whenever an investigator, be it a police officer, a [Division of Child and Family Services] employee, or any other agent

9

of the state, responds to an alleged instance of child abuse, neglect, or dependency."), *aff'd sub nom. State in Interest of A.R. v. C.R.*, 982 P.2d 73 (Utah 1999); *Milewski v. Town of Dover*, 899 N.W.2d 303, 318 (Wis. 2017) (Fourth Amendment applied to a tax assessor's entry into a home to view its interior because when "a government agent occupies private property for the purpose of obtaining information, he is conducting a search within the meaning of the Fourth Amendment").

¶ 22 The caseworkers here were governmental officials who entered Dyer's home without a warrant or consent. The record does not indicate that their entry was justified by any recognized exception to the warrant requirement. Their warrantless entry was therefore illegal under the Fourth Amendment.

¶ 23 We are not persuaded otherwise by the fact that the caseworkers had obtained an order to investigate under section 19-3-308(3)(b). It is true that this order, supported by probable cause, required Dyer and her husband to "cooperate in the investigation of possible child neglect or abuse" by producing S.D. for an interview or inspection and allowing an inspection of their home. But, unlike a search warrant, the order to investigate did not authorize the

caseworkers to enter the home without consent. If the Dyers refused to comply with the order, the caseworkers' remedy was initiating contempt proceedings, not entering the home without consent. *See* § 19-3-308(3)(b).

¶ 24      Only by obtaining a search warrant under a separate provision of the Children's Code could the caseworkers have legally entered Dyer's home without consent. Section 19-1-112(1) allows the juvenile court to issue a search warrant for the recovery of a child believed to be neglected. Such a warrant must be supported by probable cause to believe that the child is neglected and a statement of "the reasons why it is necessary to proceed pursuant to this section." § 19-1-112(2)(e), (3).

¶ 25      But the caseworkers did not obtain a warrant under section 19-1-112. They obtained only an order to investigate under section 19-3-308(3)(b). And because this order to investigate did not authorize them to enter Dyer's home without consent, their entry was illegal under the Fourth Amendment.

C. Illegal Entries Required Suppression of Caseworkers' Observations, Paramedics' Observations, and Hospital Interview

¶ 26     As discussed above, evidence obtained by exploiting a Fourth

Amendment violation must be suppressed.  *See Rodriguez*, 945 P.2d

at 1363-64.  On the other hand, "[i]f the connection between the

evidence and the illegality is 'so attenuated as to dissipate the taint,

the evidence will not be suppressed.'"  *Id.* at 1364 (quoting *Wong

Sun*, 371 U.S. at 487).

¶ 27     We conclude that the caseworkers' observations, the

paramedics' observations, and Dyer's statements during the

hospital interview were all obtained by exploiting the caseworkers'

and police officers' illegal entries into Dyer's home.  The

exclusionary rule therefore required suppression of all of this

evidence.

### 1. Caseworkers' Observations were Inadmissible

¶ 28     There is no question that the caseworkers' observations from

inside the home were a direct result of their illegal entry.  *See

Rodriguez*, 945 P.2d at 1363-64.  The prosecution argues that,

under *People in Interest of A.E.L.*, 181 P.3d 1186, 1192 (Colo. App.

2008), these observations were nevertheless admissible because the

exclusionary rule does not apply given the circumstances of this

case.  This follows, the prosecution asserts, because the

caseworkers were conducting a child welfare investigation pursuant to a civil dependency and neglect case, not a criminal investigation. We conclude that *A.E.L.* is inapposite and disagree.

¶ 29      In *A.E.L.*, another division of this court held that the exclusionary rule does not require suppression of evidence obtained as a direct result of a Fourth Amendment violation in a civil dependency and neglect proceeding.  *Id.*  The division explained that the exclusionary rule is intended to deter illegal searches and seizures by suppressing their evidentiary fruit.  *Id.* at 1191.  But the division concluded the deterrent benefits of applying the exclusionary rule in a dependency and neglect case were outweighed by the danger of leaving a neglected child in an unsafe environment.  *Id.* at 1192.

¶ 30      *A.E.L.* does not apply here because this is a criminal case. There is no danger that applying the exclusionary rule in this criminal case will cause a neglected child to be left in an unsafe environment.  Instead, the only danger in applying the exclusionary rule here is that Dyer might be acquitted of child abuse.  The prosecution cites no authority, and we are aware of none, for the

13

proposition that the exclusionary rule does not require suppression under these circumstances.

### 2. Paramedics' Observations were Inadmissible

¶ 31 The trial court ruled that the paramedics' observations from inside Dyer's home were admissible because the paramedics were not acting as agents of the police. But the trial court did not address whether the paramedics' observations should have been suppressed *regardless of* whether they were acting as agents of the police. Their observations were, in our view, a direct result of law enforcement's illegal entry into Dyer's house. The paramedics were, after all, summoned to the scene by the police, based on observations made by the police during their illegal entry into the home. The paramedics' observations inside the home were therefore a direct result of the officers' illegal entry and should have been suppressed.

### 3. Dyer's Interview at the Hospital was Inadmissible

¶ 32 Dyer also contends that the trial court erred by failing to suppress her interview at the hospital with the police officer and caseworker. Specifically, she argues that the court erred by ruling

14

that her statements were not the direct result of the officers' and caseworkers' illegal entries into her home. We agree.[3]

¶ 33   The trial court found that Dyer's hospital interview was not obtained by exploiting any illegal entry into her home because (1) the illegality "in this instance" was, in the court's view, "minor"; (2) no statements had been obtained in violation of *Miranda*; (3) the Dyers were free to go to the hospital — or not — as they pleased; and (4) "there [was] a break in time and a change of location between the unlawful entry and [the] later statements made at the hospital."

¶ 34   We disagree with the court's analysis in several regards. First, the court concluded that the illegality was "minor" because "[i]f the

---

[3] Dyer also contends that her hospital interview statements were inadmissible because they were either (1) custodial and therefore inadmissible under *Miranda v. Arizona*, 384 U.S. 436 (1966); or (2) involuntary. We express no opinion about these contentions because we conclude the statements were inadmissible as fruit of the illegal entries. If the trial court has to rule on whether these statements were custodial or voluntary on remand, it should do so based on the totality of the circumstances, which include the caseworkers' and officers' illegal entries into Dyer's home. *See Marko v. People*, 2018 CO 97, ¶ 36 (custody is evaluated based on the totality of the circumstances); *People v. Valdez*, 969 P.2d 208, 211 (Colo. 1998) (voluntariness is evaluated based on the totality of the circumstances).

Officers had waited for the DHS caseworkers prior to entry and actually performed security for them, [the police] would have rightfully been inside the home." But, as discussed above, the caseworkers had no authority to enter the home either. Accordingly, the caseworkers' presence would have done nothing to cure the officers' illegal entry. In our view, the illegality was therefore not "minor."

¶ 35     Second, the absence of a *Miranda* violation is of little consequence when evaluating whether evidence was obtained as the direct result of an illegal search. If an illegal search reveals evidence and the defendant is then questioned about that evidence, an intervening *Miranda* warning will not dissipate the taint of the illegal search. *See Perez v. People*, 231 P.3d 957, 964 (Colo. 2010). Regardless of whether government officials comply with *Miranda*, where a defendant elects to make statements to law enforcement following an illegal search, the defendant often does so "solely because of the illegal search — a defendant sees that an officer has obtained the incriminating evidence and then speaks." *Id.*; *see* 6 Wayne R. LaFave, *Search and Seizure* § 11.4(c), Westlaw (5th ed. database updated Oct. 2018) ("[W]here the defendant was present

when incriminating evidence was found in an illegal search . . . it is apparent that there has been an 'exploitation of that illegality' when the police subsequently question the defendant about that evidence or the crime to which it relates. This is because 'the realization that the "cat is out of the bag" plays a significant role in encouraging the suspect to speak.'") (citations omitted). This result is especially likely where the statements made after the illegal search relate directly to the evidence discovered during the search.

¶ 36 The potential causal link between illegally obtained evidence and later statements brings us to the third problem with the trial court's analysis: it failed to account for the fact that Dyer's interview statements were directly related to what the officers and caseworkers illegally observed in her home. At the beginning of the interview, the officer said she was assisting the officer who had been at Dyer's house earlier with the "investigation." The interviewing officer continued, "[T]he reason that we're here is because there was some concerns about [S.D.], when officers got to the house and when [the caseworkers] came to the house to check on her." Dyer then asked for clarification about the concerns,

17

asking if they were concerned "because she seized in front of them?" The officer replied, "[T]hat and a couple other things."

¶ 37 During the interview, the officer and caseworker asked about S.D.'s condition, how she came to be in that condition, and what living conditions were like in the Dyers' house. The officer repeatedly asked questions and made statements related to what the officers and caseworkers had observed in Dyer's home — matters that they were aware of only because the officers and caseworkers had illegally entered Dyer's home. Under these circumstances, we conclude that the officer and caseworker elicited Dyer's interview statements by exploiting the illegal entries into her home. These statements were therefore the direct result of the illegal entries and should have been suppressed.

#### 4. Inevitable Discovery

¶ 38 The prosecution argues that the caseworkers' and paramedics' observations and Dyer's statements at the hospital were nevertheless admissible under the inevitable discovery exception to the application of the exclusionary rule. This exception allows admission of evidence obtained in violation of the Fourth Amendment "if the prosecution can establish that the information

18

ultimately or inevitably would have been discovered by lawful means." *People v. Diaz,* 53 P.3d 1171, 1176 (Colo. 2002). The prosecution must affirmatively show that the lawful means of discovering this evidence was already initiated when the evidence was obtained illegally. *See People v. Syrie,* 101 P.3d 219, 223 (Colo. 2004).

¶ 39 The prosecution did not raise the doctrine of inevitable discovery in its written response to Dyer's motions to suppress or during the suppression hearing. Instead, the prosecution first raised this issue in its answer brief on appeal. This does not bar our review; an appellate court may affirm a lower court's decision on any ground supported by the record, whether relied upon or even considered by the trial court. *See People v. Aarness,* 150 P.3d 1271, 1277 (Colo. 2006). But we are unable to resolve the inevitable discovery issue here. The record does not clearly establish that a lawful and inevitable means of discovering the evidence was in progress at the time of the illegal entries. We therefore cannot apply this doctrine without the benefit of additional factual findings.

¶ 40    The parties do not dispute that the caseworkers were pursuing an additional court order when they learned that the officers had gained entry to Dyer's home.  Although the trial court made no factual findings about this order, the record suggests that it was a search warrant.  But there is also evidence in the record suggesting that the caseworkers were unlikely to obtain the search warrant.  One caseworker's notes stated that the county attorney working on the warrant application spoke to the magistrate, who "does not think that we will be able to obtain the search warrant."  Based on this record, we cannot say that, as a matter of law, the inevitable discovery doctrine rendered admissible the caseworkers' or paramedics' observations, or Dyer's statements at the hospital.

¶ 41    Furthermore, on this record, we cannot simply remand the case to the trial court for the limited purpose of resolving this inevitable discovery issue.  It is true that doing so could potentially avoid the necessity of a new trial, saving the parties, the State, and society great cost.  *See United States v. Mechanik*, 475 U.S. 66, 72 (1986) (The reversal of a conviction "forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial that has already once taken

place[, and] victims may be asked to relive their disturbing experiences."). But we think it is inappropriate to order a limited remand to resolve an issue that was raised for the first time on appeal because it would undermine the purpose of the rules requiring parties to preserve arguments for appellate review. *See Lawmaster v. Ward*, 125 F.3d 1341, 1352 (10th Cir. 1997) ("[W]e refuse to remand to the district court a question that should have been raised in the first instance; doing so would subvert the policies the general rule is in place to protect, including the doctrines of finality and conservation of judicial resources.").

¶ 42 We reach a similar conclusion about the prosecution's argument on appeal that some of this evidence was admissible under the medical emergency exception to the warrant requirement. Like inevitable discovery, this issue was not raised in the trial court and the trial court's factual findings are insufficient for us to resolve it now.

### D. The Court's Error Requires Reversal

¶ 43 It is the prosecution's burden to prove that the court's failure to suppress the caseworkers' and paramedics' observations from inside the home and Dyer's statements at the hospital was

21

harmless beyond a reasonable doubt. *See Morehead*, ¶ 34. Because the prosecution has failed to present any argument that admission of the evidence that should have been suppressed was harmless beyond a reasonable doubt, it has failed to meet its burden, requiring us to reverse Dyer's conviction and remand for retrial.

¶ 44 On remand, the trial court is bound by our determinations that the caseworkers were subject to the Fourth Amendment and that their entry was illegal under the Fourth Amendment. The trial court is also bound by our determination that, based on the arguments and evidence presented at the prior suppression hearing, the exclusionary rule required suppression of the caseworkers' and paramedics' observations and Dyer's hospital interview.

¶ 45 That said, on remand the prosecution may present arguments for the admission of otherwise suppressible evidence that it failed to raise in the first proceeding. *Id.* at ¶ 19. Given that the prosecution raised inevitable discovery on appeal, it is likely that the prosecution will raise it on remand as well. Other issues, such as the medical emergency exception, may also be raised. If the

prosecution raises these issues and the court, in its discretion, considers them, the trial court should make factual findings and conclusions of law with respect to the matters in the record as well as any additional evidence it deems relevant.

### III. Other Issues

¶ 46    Dyer raises other issues on appeal. Because of the manner in which we have resolved this appeal, we address only those issues that are likely to recur at a new trial, and only for the purpose of giving the trial court guidance in conducting the new trial.

#### A. Alleged Seizure of S.D. from Dyer's Home

¶ 47    Dyer argues that taking S.D. from her home to the hospital without Dyer's consent constituted an illegal seizure in violation of the Fourth Amendment and requires suppression of all evidence obtained as a direct result. Although Dyer raised this issue at the suppression hearing, the trial court neither made factual findings about it nor ruled on the ultimate issue. We therefore do not address it. But nothing in this opinion precludes the parties from raising this issue on remand.

#### B. Alleged Instructional Error

¶ 48    Dyer next argues that the trial court committed two instructional errors.  It is the trial court's duty to accurately instruct the jury on all matters of law relevant to the case.  *See Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011).  We review the instructions de novo to determine whether the trial court did so.  *Id.*

### 1.  A Medical Neglect Instruction was Unnecessary

¶ 49    Dyer first argues that she was entitled to an instruction distinguishing medical neglect from child abuse.  We disagree.

¶ 50    "[A] witness may not testify that a particular legal standard has or has not been met."  *People v. Beilke*, 232 P.3d 146, 152 (Colo. App. 2009).  As relevant here, this means that no witness could testify that Dyer committed the offense of child abuse or that her conduct satisfied a necessary element of that offense.

¶ 51    Several medical experts testified at trial that S.D. was neglected or medically neglected.  According to Dyer, this testimony was akin to a legal opinion that she had committed child abuse, and she was therefore entitled to an instruction differentiating medical neglect and child abuse.  We are not persuaded.

¶ 52    There is no danger that the jury would have understood testimony that S.D. was medically neglected as a legal opinion that

Dyer committed child abuse. The instructions, in accordance with the child abuse statute, section 18-6-401, C.R.S. 2019, identified the elements of child abuse as knowingly or recklessly "engag[ing] in a continued pattern of conduct that result[s] in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately result[s] in serious bodily injury to a child." The terms "medical neglect" and "neglect" did not appear in the instructions defining child abuse. Nor does the child abuse statute include these terms. We therefore conclude that the trial court properly refused to give the requested instruction.

## 2. A Modified Unanimity Instruction was Unnecessary

¶ 53    We also disagree with Dyer's argument that the trial court erred by failing to give a modified unanimity instruction that would have required the jurors to agree on the specific acts or omissions she committed.

¶ 54    Section 16-10-108, C.R.S. 2019, requires unanimous jury verdicts. In general, this requirement means that each juror must agree that each element of the crime charged has been proved beyond a reasonable doubt. *See People v. Wester-Gravelle*, 2018 COA 89M, ¶ 21 (*cert. granted* Sept. 9, 2019). Even so, jurors need

not agree about the evidence or theory by which a particular element is established.  *Id.*

¶ 55    Dyer's argument rests on an exception to this general rule.  If a defendant is charged with a single offense, and the prosecution presents evidence of multiple alternative, discrete acts that could each constitute the offense, and there is a reasonable likelihood that jurors may disagree about which alternative act the defendant committed, the jury must agree that the defendant committed the same act or acts.  *Id.* at ¶ 22.  This exception does not apply, however, when the prosecution charges a continuing course of conduct.  *Id.* at ¶ 24.  When the prosecution charges a continuing course of conduct, the jurors need only agree that the defendant engaged in a continuing course of conduct for which he or she is criminally liable — they need not agree on the acts constituting that course of conduct.  *Id.*

¶ 56    Here, the prosecution alleged that Dyer committed child abuse by engaging in a continuing course of conduct.  Consequently, the jurors did not need to agree on the acts or omissions constituting the course of conduct, and the trial court properly declined to give Dyer's requested instruction.

## C. Additional Evidentiary Error

¶ 57    Dyer also challenges several of the trial court's evidentiary rulings. We review these arguments for an abuse of discretion. *See People v. Brown*, 2014 COA 155M-2, ¶ 5.

¶ 58    First, Dyer argues that the court erred by admitting evidence of the dependency and neglect proceeding in violation of section 19-3-207(2), C.R.S. 2019. The statute provides that "[n]o professional shall be examined in any criminal case without the consent of the respondent as to statements made pursuant to compliance with court treatment orders, including protective orders, entered under [the dependency and neglect statutes]."

¶ 59    We question whether, as the prosecution argues in its answer brief, any error in admitting evidence in violation of this statute was invited by Dyer. Nevertheless, on remand the trial court should ensure that it complies with this statute.

¶ 60    Second, Dyer argues that the trial court erred by admitting evidence of S.D.'s improvement in foster care, after the alleged abuse in this case ended. She argues that this evidence was irrelevant and unfairly prejudicial. She also argues that some of it was unqualified expert testimony. We disagree.

¶ 61    Evidence that S.D. improved after being placed in foster care was indirect and circumstantial evidence that her health and developmental problems were caused by Dyer and her husband.  It was therefore relevant.  *See* CRE 401 (Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

¶ 62    We further conclude that it was not unduly prejudicial or inflammatory.  The evidence merely juxtaposed S.D.'s condition while in Dyer's care with her condition in foster care.

¶ 63    Dyer also argues that lay witnesses offered expert testimony about "technical improvements" S.D. made after being placed in foster care.  According to Dyer, this testimony was unqualified expert testimony and was therefore inadmissible.  *See* CRE 701 (lay witness testimony must not be based on "scientific, technical, or other specialized knowledge within the scope of Rule 702); CRE 702 (witness must be qualified as an expert to offer technical or specialized knowledge).  But she does not identify these technical improvements, nor does she further explain why testimony on them was expert testimony rather than lay opinion testimony.  We

therefore reject this argument. *See People v. Durapau*, 280 P.3d 42, 49 (Colo. App. 2011) (declining to address bare and conclusory assertions without supporting argument and authority).

## D. Severance

¶ 64 Dyer also argues that the trial court erred by denying her motion to sever her case from her husband's and, instead, trying the cases together. We do not address this issue because if it recurs at all, it will likely recur under different circumstances.

## IV. Conclusion

¶ 65 The judgment of conviction is reversed, and the case is remanded for a new trial consistent with the views expressed in this opinion.

JUDGE DAILEY and JUDGE TERRY concur.