23CA1461 Peo v Pompa 04-30-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1461
Arapahoe County District Court No. 20CR476
Honorable Eric White, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kevin Adam Pompa,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE GOMEZ
Pawar and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 30, 2026

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Phalen Kohlruss-Reuman, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Mackenzie R. Shields, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Kevin Adam Pompa, appeals the judgment of conviction entered after a jury convicted him of burglary, criminal trespass, and menacing.  He argues that (1) his statutory right to a speedy trial was violated; (2) the trial court erroneously admitted testimonial hearsay statements in violation of his Confrontation Clause rights; and (3) the trial court allowed the prosecutor to engage in reversible misconduct during closing argument.  We reject his arguments and affirm the judgment.

## I.     Background

¶ 2     Pompa and the victim had a casual relationship after meeting on a dating website.  A few months into their relationship, the victim moved apartments.  She and Pompa agreed that she would pay him $350 to help her move.  When Pompa came to help, he brought his wife and mother-in-law.

¶ 3     The victim said that things with Pompa were awkward after the move because she'd thought he was separated from his wife and because he complained he should've been paid more for his help.  She agreed to pay him more but needed time to do so.  Eventually, he became more demanding about the money in phone calls and text messages with her.

¶ 4 About a month after the move, the victim was woken up by a knock at her door. She asked who was there and heard someone say, "[M]aintenance." She testified that she cracked the door open and saw Pompa, who shoved her door open, walked inside with a gun in his hand, and started demanding money and threatening to shoot her. When she refused to give him money, he hit her in the head with the gun. She fell to the ground and lost consciousness.

¶ 5 When the victim regained consciousness, she realized she was bleeding heavily from her head. She called 911, and her neighbor came to help after hearing her screams. The victim and her neighbor told the 911 operator what had happened and that the attacker had fled with another person in a white truck.

¶ 6 Later on, the victim was confused about some of the details of the attack, like how her fingernail was broken, how her TV got knocked over, and why beer bottles were scattered on the floor. But her account that Pompa had been to her apartment was later corroborated by a vehicle registration record showing that Pompa owned a white truck and by cell phone data that showed Pompa in the area of the victim's apartment at the time of the attack.

¶ 7 Pompa didn't testify at trial. His theory of defense was that the victim either made up the story or was attacked by someone else, and that she accused him because she was mad when she found out he wasn't separated from his wife. The jury convicted him on charges of first degree burglary, first degree criminal trespass, and felony menacing, while acquitting him on another first degree burglary charge and a charge of second degree assault.

¶ 8 This appeal followed.

## II.  Speedy Trial

¶ 9 Pompa first contends that his statutory right to a speedy trial was violated. Specifically, he asserts that the trial court erred in rejecting his speedy trial challenge by (1) concluding that he was unavailable while he was in federal custody; (2) incorrectly determining the start date of his period of unavailability; and (3) miscalculating the new speedy trial deadline after he became available. We aren't persuaded.

## A.  Timeline

¶ 10 The events giving rise to Pompa's charges occurred in early 2020. After his initial arrest, Pompa was released on bond. On July 27, 2020, he pleaded not guilty. The trial court calculated the

initial speedy trial deadline as January 27, 2021, and trial was set to begin on January 5.

¶ 11    On November 11, 2020, the prosecution learned that Pompa was in federal custody but was being held in the Denver County Jail.  The next day, the prosecution requested, and the court issued, a writ to the Denver Sheriff Department so Pompa could appear remotely for a motions hearing on November 13.  Pompa failed to appear at that hearing.  At that time, the court declared a mistrial due to the COVID-19 pandemic, *see* Crim. P. 24(c)(4); *People v. Sherwood*, 2021 CO 61, ¶ 3, and calculated the new speedy trial deadline as April 27, 2021.  The court set the trial to begin on April 13.

¶ 12    In March 2021, the prosecution requested, and the court issued, a writ to the United States Marshals Service's District Office in Denver — where Pompa was assumed to be — for him to appear at an April 7 pretrial readiness conference.  The same day the court issued the writ, Pompa filed a letter with the court saying he was "finishing up [a] [f]ederal sentence in [Bureau of Prisons] custody."  The return address on the letter was a federal correctional facility in Oklahoma.

¶ 13     When Pompa didn't appear at the April 7 conference, the prosecution began searching for his precise location and learned he was in a federal facility in California.  The prosecution then filed a motion asking the court to issue a warrant for Pompa's arrest so it could lodge a detainer with that California facility, noting that Pompa could be brought back to Colorado either under the Interstate Agreement on Detainers (IAD), § 24-60-501, C.R.S. 2025, or  through the extradition process after his federal sentence concluded.  The prosecution also asked the court to find Pompa unavailable under section 18-1-405(6)(d), C.R.S. 2025, and to reset the speedy trial deadline because the prosecution "cannot simply writ a [d]efendant, from a federal prison, located in another state."

¶ 14     The court concluded that Pompa was unavailable under section 18-1-405(6)(d) and that "the period of his unavailability should be excluded from statutory speedy trial."  The court further concluded that Pompa's period of unavailability began on November 13, 2020, when he first failed to appear.  The prosecution lodged a detainer for Pompa's return to Colorado, but Pompa never requested action under the IAD while he remained in federal

5

custody.  On September 7, 2021, he was released from federal custody and brought back to Colorado.

¶ 15    Following Pompa's return to Colorado and the resumption of efforts to set a trial date in this case, defense counsel filed a motion to dismiss, asserting that the speedy trial deadline had already passed.  The court held a hearing, after which it denied the motion.

¶ 16    After another COVID-19-related mistrial and a speedy trial waiver by Pompa, the trial in this case was held in October 2022.

### B.    Relevant Legal Standards

¶ 17    We review a trial court's denial of a motion to dismiss for violation of a defendant's speedy trial rights as a mixed question of law and fact.  *People v. Burdette*, 2024 COA 38, ¶ 37.  We won't disturb the court's factual findings if they are supported by the record, *id.*, but we review de novo the court's application of the speedy trial statute, *People v. Curren*, 2014 COA 59M, ¶ 13.

¶ 18    Section 18-1-405 secures a defendant's constitutional right to a speedy trial.  *People v. Lucy*, 2020 CO 68, ¶ 20.  The statute provides, in pertinent part, that a defendant must be "brought to trial . . . within six months from the date of the entry of a plea of not guilty."  § 18-1-405(1).  When computing the deadline for trial,

any period of delay caused by the "unavailability of the defendant" or by a mistrial is excluded. § 18-1-405(6)(d), (e). The burden of complying with these provisions lies with the trial court and the prosecution. *People v. DeGreat*, 2020 CO 25, ¶ 17.

## C. Pompa's Unavailability

¶ 19　We first consider whether the trial court properly determined that Pompa was unavailable for purposes of the speedy trial statute while he was in federal custody. We conclude that it did.

¶ 20　A defendant is unavailable "whenever [their] whereabouts are known but [their] presence for trial cannot be obtained." § 18-1-405(6)(d). But "a defendant's incarceration outside the state does not make [them] 'unavailable' for the purposes of speedy trial considerations unless the prosecution can show that despite diligent efforts the defendant's presence could not be secured." *Watson v. People*, 700 P.2d 544, 548 (Colo. 1985).

¶ 21　When the trial court was initially presented with Pompa's absence due to his incarceration at a federal facility in California, it found that Pompa was "unavailable" within the meaning of section 18-1-405(6)(d). Then, in ruling on Pompa's later motion to dismiss, the court made more robust findings that the prosecution had acted

7

diligently in trying to determine where he was and secure his presence for trial.

¶ 22    In challenging the trial court's rulings, Pompa relies largely on *People v. Byrne*, in which our supreme court held that the facts of that case — including that the prosecution never requested a writ to the United States Marshal after learning the defendant was in federal custody — supported the trial court's conclusion that the prosecution hadn't made diligent efforts to obtain the defendant's presence for trial.  762 P.2d 674, 677 (Colo. 1988).

¶ 23    The facts here are markedly different from those in *Byrne*, and the record supports the trial court's conclusion that the prosecution made sufficient efforts to try to obtain Pompa's presence.  As soon as the prosecution was made aware that Pompa was in federal custody but being held at the Denver County Jail, it requested a writ to the proper federal authorities.  For whatever reason, that writ was ineffective and Pompa didn't appear before the court in November 2020.  Without further information, the prosecution assumed Pompa to be in the same location and requested a writ to secure his presence at a scheduled court date in April 2021.  When that writ was also ineffective and the prosecution learned Pompa

8

was no longer in Colorado, the prosecution searched for his location and discovered he was in a federal facility in California. Again, the prosecution petitioned the court for the proper legal mechanism to secure Pompa's presence under the IAD or via extradition. Accordingly, it is evident that the prosecution made diligent — albeit initially unsuccessful — efforts to secure Pompa's presence from early on in the case.

### D. Determining the Period of Pompa's Unavailability

¶ 24 Having concluded that the trial court properly determined that Pompa was unavailable, we next consider whether the trial court correctly determined the start date of that period of unavailability. We conclude that it did.

¶ 25 The record supports the trial court's determination that the period of Pompa's unavailability ran from November 13, 2020 — when the prosecution knew Pompa was in federal custody and it was first unable to secure his presence through a writ to federal authorities — to September 7, 2021 — when Pompa was released from federal custody and brought to Colorado.

¶ 26 We are unpersuaded that the trial court erred in applying its finding of unavailability in April 2021 to determine that Pompa's

9

period of unavailability began in November 2020. Pompa relies on *People v. Nunez,* in which the supreme court rejected a trial court's attempt to retroactively declare a mistrial after the speedy trial deadline had passed. 2021 CO 31, ¶¶ 6-10, 23. But *Nunez* is inapposite for two reasons. First, the trial court here was still within the speedy trial deadline, having timely declared a mistrial in November 2020 due to the COVID-19 pandemic. And second, the court's "retroactive" application of its unavailability finding to the first time Pompa failed to appear was not an effort "to get around the mandatory deadlines set by Colorado's speedy trial statute." *Id.* at ¶ 20. Instead, the court was merely calculating Pompa's period of unavailability, and it accurately included the time when Pompa's presence couldn't be secured despite the prosecution's diligent efforts. *See* § 18-1-405(6)(d); *Watson,* 700 P.2d at 548.

### E. Calculating the Speedy Trial Deadline After Pompa's Period of Unavailability

¶ 27   We now consider whether the trial court properly calculated the amount of time to be excluded from the speedy trial deadline based on the COVID-19 mistrial and Pompa's unavailability.

¶ 28    Crim. P. 24(c)(4) allows a court to declare a mistrial due to a public health crisis like COVID-19. *See Sherwood*, ¶ 3 (applying the rule). When a mistrial is declared, it tolls the speedy trial deadline for "[t]he period of delay caused by [the] mistrial, not to exceed three months for each mistrial." § 18-1-405(6)(e).

¶ 29    Pompa asserts that it was inappropriate for the trial court to exclude the three-month period for the COVID-19 mistrial declared on November 13, 2020 because it also concluded that Pompa's period of unavailability began on that same day. In essence, Pompa argues that the court couldn't double count the days excluded from the speedy trial deadline by counting the same days as part of the mistrial period and as days when Pompa was unavailable.

¶ 30    We decline to consider whether the court erred in these calculations because its exclusion of a period of three months in calculating the speedy trial deadline can be supported another way. *See People v. Dyer*, 2019 COA 161, ¶ 39 ("[A]n appellate court may affirm a [trial] court's decision on any ground supported by the record, whether relied upon or even considered by the trial court."). Specifically, under section 18-1-405(6)(h), the court could exclude "[t]he period of delay between the new date set for trial following the

11

expiration of the time period[] excluded by paragraph[] . . . (d) [regarding a period of unavailability], not to exceed three months." Thus, the three additional months the court added to the speedy trial deadline based on the first COVID-19 mistrial (beginning on November 13, 2020) could instead be attributed to the three months after Pompa's period of unavailability ended (beginning on September 7, 2021), leading to the same speedy trial deadline.[1]

¶ 31    Accordingly, we affirm the trial court's ultimate calculation of the amount of time that should be excluded from the speedy trial deadline under section 18-1-405.  And because Pompa doesn't raise any other challenges to the court's calculations, and the trial commenced within the extended speedy trial period following the second COVID-19-related mistrial and Pompa's speedy trial waiver, we reject Pompa's claim that his speedy trial rights were violated.

---

[1] Pompa argues that the prosecution didn't raise this argument in the trial court.  But the prosecution did alert the trial court to the additional three-month extension available under section 18-1-405(6)(h), C.R.S. 2025.  And while the trial court didn't rely on subsection (6)(h) in its calculations, we can, as indicated, affirm the judgment on any basis supported by the record.  *See People v. Dyer*, 2019 COA 161, ¶ 39.

### III. Hearsay Evidence

¶ 32 Pompa also contends that the trial court erred by admitting portions of the victim's 911 call that included statements from the victim's neighbor. He asserts that the neighbor's statements were testimonial for purposes of the federal and state Confrontation Clauses and that even if they weren't, they don't fall within the excited utterance exception to the hearsay rule. We disagree.

### A. Additional Facts

¶ 33 Before trial, the prosecution filed a notice of its intent to introduce statements made by the victim's neighbor during the victim's 911 call. The relevant portion of the 911 call included the following exchange:

> Operator: Can you tell me what happened? Do you know what's going on?
>
> Neighbor: I heard her screaming really, really loud, and I just kind of came down the stairs to help her. She's bleeding all over. As I was coming down the stairs, I had seen two Mexican guys went into a white truck.
>
> Operator: So they left in a white truck?
>
> Neighbor: Yeah. It was a white pickup truck, and there was damage to the front. But she says she has the license plate number.
>
> Victim: I do. It's in my phone.

13

Operator: Okay. Did you see what they looked like? I know you said they were Hispanic. Did you see where [inaudible]

Neighbor: [inaudible] she has a picture of them in her phone.

. . . .

Operator: And did you see what direction they went in?

Neighbor: They just took the exit out of the complex. I don't know.

¶ 34 Defense counsel objected on the grounds that the statements were testimonial and were inadmissible hearsay. The court overruled the objection.

¶ 35 The 911 call was played at trial. The neighbor did not testify.

## B. The Confrontation Clause

¶ 36 We reject Pompa's contention that the neighbor's statements violated his Confrontation Clause rights.

¶ 37 We review de novo a trial court's ruling on whether the admission of evidence violates a defendant's Confrontation Clause rights. *See Nicholls v. People*, 2017 CO 71, ¶ 17.

¶ 38 The Confrontation Clauses in the federal and state constitutions — which allow a defendant to be confronted with the witnesses against them — are implicated only by testimonial

14

statements, not nontestimonial statements. *Davis v. Washington*, 547 U.S. 813, 821-25 (2006); *Nicholls*, ¶¶ 23, 30. A testimonial statement is one made "under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Nicholls*, ¶ 22. Relevant circumstances in determining whether a statement is testimonial include whether there was an ongoing emergency at the time it was made, its formality and spontaneity, the environment in which it was made, and the identity of the person to whom it was made. *People v. McFee*, 2016 COA 97, ¶ 37.

¶ 39    The trial court concluded that the neighbor's statements during the 911 call were nontestimonial because the call was "made to a 911 operator," not "to a police department"; the call "was made under . . . emergency circumstances" to convey and receive "emergency information," rather than "circumstances specifically designed to create an out-of-court statement for use in trial"; and the neighbor's statements "relate[d] to the nature of the emergency [she was] observ[ing]."

¶ 40    We agree. The neighbor made the statements to a 911 operator during an ongoing emergency. First responders hadn't yet

15

arrived, and the attacker had just fled the scene and hadn't been apprehended. Some of the neighbor's statements that weren't challenged related to the victim's name and physical condition and the actions the neighbor was taking to treat the victim before emergency personnel arrived. Yet even the challenged statements concerning the attacker's description and the vehicle he left in were made to the 911 operator in the context of the emergency and may have assisted first responders in assessing whether the attacker might return or might confront them as they were responding to the call. *See Davis*, 547 U.S. at 827-28 (the circumstances of a witness's statement to a 911 operator — including that she was facing an "ongoing emergency," she was speaking on the phone in a "not tranquil" environment where she might not be safe from her attacker, and "dispatched officers might . . . be encountering a violent felon" as they came to assist her — "objectively indicate[d] [that the statement's] primary purpose was to enable police assistance to meet an ongoing emergency"); *Raile v. People*, 148 P.3d 126, 130 (Colo. 2006) ("[S]tatements made during an ongoing emergency to assist police officers in their efforts to assess the present situation are nontestimonial.").

¶ 41    We therefore agree with the trial court's rejection of Pompa's Confrontation Clause challenge.

## C.    Hearsay

¶ 42    We also reject Pompa's contention that the neighbor's statements were inadmissible hearsay.

¶ 43    We review the admission of nontestimonial hearsay for an abuse of discretion. *People v. Phillips*, 2012 COA 176, ¶¶ 63, 75.

¶ 44    "'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." CRE 801(c). Hearsay is generally inadmissible unless it falls within an exception. CRE 802.

¶ 45    One such exception is an excited utterance, which is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." CRE 803(2); *see People v. Vanderpauye*, 2023 CO 42, ¶ 40. To fall within this exception, three conditions must be satisfied: (1) the event must have been sufficiently startling to render the observer's normal reflective thought processes inoperative; (2) the statement must have been a spontaneous reaction to the event; and (3) there must be sufficient evidence to

allow a jury to infer that the declarant had the opportunity to observe the event. *People v. Pernell*, 2014 COA 157, ¶ 31, *aff'd on other grounds*, 2018 CO 13. Relevant factors in assessing the second condition — the statement's spontaneity — include the lapse of time between the startling event and the statement, whether the statement was made in response to an inquiry, whether it was accompanied by outward signs of excitement or emotional distress, and the choice of words used. *People v. Abdulla*, 2020 COA 109M, ¶ 65.

¶ 46     We conclude that the court didn't abuse its discretion by admitting the neighbor's statements under the excited utterance exception. The court aptly addressed all three conditions in finding the exception applied.

¶ 47     First, the court concluded that the event was sufficiently startling to render the neighbor's normal reflective thought processes inoperative. The court reasoned that "although [she] isn't panicked in this statement, . . . she's still right in the middle of a 911 call . . . in the same vicinity as her neighbor who is bleeding from her head." In other words, the court explained, "I think that sitting in her home with a bleeding woman having just witnessed

18

people fleeing from a scene is a startling event that would render a person's [thought] processes inoperative."

¶ 48 Second, the court concluded that the neighbor's statements were a spontaneous reaction to the event. The court reasoned that "although there were questions asked to kind of clarify the initial information" the neighbor had given, "the information conveyed was a spontaneous reaction to the occurrence. 'I just saw this. This is what happened. This is who I saw. This is where they went.'"

¶ 49 And third, the court noted that, as of the time of its ruling, the prosecution had indicated that it would present sufficient evidence to allow a jury to infer that the neighbor had observed the startling event. The court indicated that if the prosecution didn't satisfy that foundational burden, it would take an objection as to the third prong. No such objection was lodged.

¶ 50 The trial court thus applied the appropriate considerations, and we don't perceive any abuse of discretion in its ruling.

IV. Prosecutorial Misconduct

¶ 51 Finally, Pompa contends that the trial court erred when it allowed the prosecutor to commit misconduct during closing argument by (1) misstating the law on reasonable doubt, thus

lowering the prosecution's burden of proof; and (2) urging the jury to do justice and hold him accountable. We disagree that there was any error in allowing the first argument. As to the second, we conclude that any error was harmless.

## A. Relevant Legal Standards

¶ 52    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. *People v. Buckner*, 2022 COA 14, ¶ 17. We determine first "whether the prosecutor's questionable conduct was improper based on the totality of the circumstances" and then "whether such actions warrant reversal according to the proper standard of review." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010); *accord People v. Robinson*, 2019 CO 102, ¶ 18.

¶ 53    When, as here, objections are preserved, we consider whether any error by the trial court in allowing a prosecutor's improper statements "substantially influenced the verdict or affected the fairness of the trial proceedings." *Hagos v. People*, 2012 CO 63, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

## B. Comments on Reasonable Doubt

¶ 54    Pompa first argues that the trial court erred by permitting the prosecutor's references to the reasonable doubt standard in closing

20

argument, which he claims misstated the law and lowered the prosecution's burden of proof. We disagree.

¶ 55 During closing argument, the prosecutor said,

> I want to leave you with a reasonable doubt instruction; you're going to have a full copy of it, but it tells you that a reasonable doubt is not vague, it's not speculative, it's not imaginary, and what I want to remind you is that you can have questions about the facts of this case. You might wonder how did her TV get knocked over. If that question does not go to an element of one of these charged crimes, then the defendant is guilty.

¶ 56 Defense counsel lodged an objection, to which the court responded that the jury was to consider and apply the instructions as given by the court. The prosecutor then continued,

> As we talked about, what we had to prove was the element of each crime beyond a reasonable doubt. It's not all doubt, so if you have questions and they're not related to those elements, the defendant is still guilty.

¶ 57 A prosecutor may not intentionally misstate the law. *People v. Herold*, 2024 COA 53, ¶ 69. This includes making statements that lessen the applicable burden of proof. *See People v. Pollard*, 2013 COA 31M, ¶ 48. That burden of proof requires the prosecution to "prove every factual element necessary to constitute the crime

charged beyond a reasonable doubt." *Johnson v. People*, 2019 CO 17, ¶ 10 (quoting *Vega v. People*, 893 P.2d 107, 111 (Colo. 1995)); *accord Tibbels v. People*, 2022 CO 1, ¶ 23.

¶ 58    We conclude that the prosecutor's statements did not misstate the law on reasonable doubt or lower the prosecution's burden of proof.  The prosecutor correctly noted that the prosecution has the burden to prove every element of the charged crimes beyond a reasonable doubt and that any doubt unrelated to those elements doesn't necessarily affect this burden.  Therefore, the court didn't err by allowing the statements.

### C.    Comments on Justice and Accountability

¶ 59    Pompa also argues that the trial court reversibly erred by overruling his counsel's objection to the prosecutor's statement referencing justice and accountability.  Again, we disagree.

¶ 60    Toward the end of the prosecutor's closing argument, she said,

> I'm going to ask each and every one of you to take your time, to look at the evidence, to use your memory of the testimony, and to return the verdict that justice demands holding the defendant accountable.

¶ 61    Defense counsel objected.  The court overruled the objection.

¶ 62    "A prosecutor may not 'pressure jurors by suggesting that guilty verdicts are necessary to do justice for a sympathetic victim.'" *Buckner*, ¶ 40 (quoting *People v. Marko*, 2015 COA 139, ¶ 221). Nonetheless, a prosecutor's request that jurors hold a defendant accountable may be proper if it's based on evidence of guilt and simply asks that the defendant be held accountable for a crime they committed. *See People v. Tran*, 2020 COA 99, ¶ 68.

¶ 63    We conclude that any error in overruling the objection and allowing the prosecutor's statement was harmless for four reasons. First, the statement was one sentence in the entirety of the prosecutor's closing argument. *See People v. Garcia*, 2021 COA 80, ¶ 40 (reversal wasn't required for a prosecutor's appeal to justice that was "brief and a small part of summation"), *aff'd*, 2023 CO 30. Second, the statement was "likely to be interpreted by the jury as merely an overly dramatic and inartful way of asking the jury to return a guilty verdict based on the evidence." *People in Interest of J.R.*, 2021 COA 81, ¶ 47 (reversal wasn't required although the prosecutor asked the jury to "vindicate" the victims by holding the defendant accountable). Third, the jury returned a split verdict, indicating that it "was not swayed by any potentially improper

argument." *People v. Snelling*, 2022 COA 116M, ¶ 37. And fourth, substantial evidence supports the jury's guilty verdict. *See People v. Dominguez-Castor*, 2020 COA 1, ¶ 86 ("the strength of the other evidence of guilt" may support the harmlessness of a trial court's error in allowing improper argument). Accordingly, Pompa's assertion of prosecutorial misconduct doesn't require reversal.

## V. Disposition

¶ 64 The judgment is affirmed.

JUDGE PAWAR and JUDGE JOHNSON concur.