21CA1175 Peo v McConnell 06-26-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 21CA1175
Jefferson County District Court No. 19CR4598
Honorable Jeffrey R. Pilkington, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Samuel McConnell,

Defendant-Appellant.

---

JUDGMENT AND ORDER AFFIRMED

Division II
Opinion by JUDGE HARRIS
Fox and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 26, 2025

---

Philip J. Weiser, Attorney General, Marixa Frias, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Mackenzie R. Shields, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Samuel McConnell, robbed a gas station convenience store at gunpoint.  As he made his escape, an off-duty police officer fired at him, and McConnell fired back, injuring the officer.  The prosecution charged him with aggravated robbery, attempted first degree murder, first degree assault, and a host of lesser offenses.

¶ 2    At trial, McConnell did not contest the aggravated robbery charge, but he claimed that he shot the officer in self-defense.  The jury acquitted McConnell of attempted first degree murder and first degree assault, but it found him guilty of aggravated robbery, second degree assault involving recklessness, and the lesser offenses.

¶ 3    On appeal, McConnell contends that the trial court erred by instructing the jury on the initial aggressor exception to self-defense, permitting the prosecutor to misstate the law of self-defense in closing argument, refusing to suppress statements made during a police interrogation, and entering an untimely restitution order.

¶ 4    We reject each of these contentions and therefore affirm.

## I.    Self-Defense

¶ 5    McConnell says that the court committed two errors that improperly undermined his self-defense claim: First, the court instructed on the initial aggressor exception despite a lack of evidence to support it, and second, the court allowed the prosecutor to suggest, contrary to Colorado law, that he had a duty to retreat.

### A.    Initial Aggressor Instruction

#### 1.    Legal Principles and Standard of Review

¶ 6    Under Colorado law, a person has the right to use physical force (including, in certain circumstances, deadly force) against another person to defend himself or a third party from what he reasonably believes to be the use of unlawful physical force by that other person.  § 18-1-704(1)-(2), C.R.S. 2024.

¶ 7    But there are exceptions to this general rule.  As relevant here, a person is not justified in using physical force to defend himself if he was the "initial aggressor."  § 18-1-704(3)(b).  Thus, one way for the prosecution to disprove the affirmative defense of self-defense is to prove beyond a reasonable doubt that the defendant was the initial aggressor.  *People v. Mosley*, 2021 CO 41, ¶ 18.  An initial aggressor is the person who "initiated the physical conflict by using

2

or threatening the imminent use of unlawful physical force."
*Castillo v. People*, 2018 CO 62, ¶ 41 (citation omitted).

¶ 8    "The trial court has a duty to correctly instruct the jury on all matters of law for which there is sufficient evidence to support giving instructions." *Id.* at ¶ 34.  Therefore, when a trial court instructs the jury on the defense of self-defense, it should also instruct on the initial aggressor exception to that defense if there is "some evidence" to support the exception.  *Galvan v. People*, 2020 CO 82, ¶ 25.  "[S]ome evidence" means evidence sufficient to support a reasonable inference that the defendant was the initial aggressor.  *People v. Roberts-Bicking*, 2021 COA 12, ¶ 31.

¶ 9    We review de novo whether sufficient evidence exists to support an initial aggressor instruction.  *Id.* at ¶ 32.  In doing so, we view the evidence in the light most favorable to giving the instruction.  *Galvan*, ¶ 33.

### 2.    Relevant Facts and Ruling

¶ 10   Much of the evidence at trial was uncontested, as most of the incident was captured on surveillance video.

¶ 11   That morning, McConnell pulled up to the convenience store, left the car running with his infant daughter in the back seat, and

entered the store. He showed the cashier a gun and demanded money from the register. When he left the store, he encountered another man who, some evidence showed, yelled, "[S]top," and then fired his gun at McConnell. After an exchange of gunfire, McConnell got into his car and drove away. He was arrested later that evening.

¶ 12    But the surveillance cameras did not record the moment that the other man fired the initial shots at McConnell. The testimony about that interaction was conflicting.

¶ 13    McConnell testified that as he was collecting the money, he put his gun in the front pocket of his sweatshirt, and he left the store with the gun still in his pocket. He said that as he walked toward his car, he heard two gunshots. When he turned in the direction of the shots, he saw a man pointing a gun at him. The man, who turned out to be an off-duty police officer, was not in uniform and did not display a badge. According to McConnell, he then took the gun out of his pocket and returned fire, because "somebody was shooting at [him], and [he] was standing next to the car that had [his] daughter in it." McConnell said that he did not hear or see the officer before the moment he turned to return fire.

¶ 14    The officer gave a different version of the interaction.  He testified that as he pulled up to the gas pumps, a person warned him not to go inside the store because it was being robbed.  He "drew [his] weapon" and approached the store entrance.  He saw McConnell walk toward the car and then turn and lift his elbow.  The movement of McConnell's elbow was a "red flag" because it indicated to the officer that McConnell "was doing something, like pulling something out of his pocket."  A "millisecond[]" later, he saw a dark "metal square" that McConnell then pointed at him so that he "was looking right down the barrel of th[e] gun."  When he saw the gun barrel, he "fire[d] [his] weapon" toward McConnell because "it look[ed] like [McConnell] [was] ready to shoot [him]."  After the exchange of gunfire, the officer's gun jammed, and he retreated behind a gas pump, at which point McConnell drove away.

¶ 15    The trial court agreed to instruct the jury on self-defense as both an affirmative defense to certain charges and a traverse to others.  The dispute centered on whether the court should also instruct on the initial aggressor exception to self-defense.  The prosecutor argued that the evidence supported giving the exception in part because the officer had testified that "he did not discharge

his weapon until he, in his own words, was looking straight down the barrel of that gun." Defense counsel argued that the initial aggressor instruction would "send a signal to the jury" that the officer's actions were lawful, thereby depriving McConnell of his self-defense claim.

¶ 16    In a comprehensive oral ruling, the trial court explained that the evidence supported giving an initial aggressor instruction under two theories. First, McConnell was the initial aggressor "when he began and until he completed the armed robbery." And second, even viewing the encounter more narrowly, McConnell was the initial aggressor with respect "to the shootout with [the officer]." Regarding the latter theory, the court reasoned that the jury could find that McConnell responded to the officer's command to stop by "drawing his firearm and pointing it in the direction [from] which the command came." The court noted the officer's testimony that he "saw defendant draw a gun" and then "realized he was staring down the barrel of a gun and fire was exchanged."

¶ 17    During closing argument, the prosecutor asserted that McConnell was the initial aggressor because "he start[ed] the chain of events and show[ed] the initial force" during the robbery. But he

also said that McConnell was the initial aggressor because, when the officer told him to stop, McConnell ignored the order and "brought his gun up on [the officer]."

### 3. Analysis

¶ 18 McConnell contends that the court misapplied the law by determining that the initial aggressor exception applied based on his commission of the robbery. He says that to be the initial aggressor, he had to use or threaten the use of force against the officer before the officer used force against him — and there was no evidence that he did so.

¶ 19 The People defend both bases of the court's decision to give the instruction. We are skeptical that a defendant qualifies as an initial aggressor merely because he could be viewed as the catalyst for the victim's initial use of force. After all, the statutory language itself establishes that being the "initial aggressor" (i.e., the one to initiate the physical conflict) is an exception to the defendant's right to use force against "another person" to defend himself from the unlawful use of physical force "by that other person." § 18-1-704(1), (3)(b).

¶ 20 But we need not resolve that issue because we conclude there was "some evidence" that McConnell was the initial aggressor with

respect to the officer. *Galvan*, ¶ 25; *see also People v. Dyer*, 2019 COA 161, ¶ 39 ("[A]n appellate court may affirm a lower court's decision on any ground supported by the record . . . ."). As the prosecutor and the court noted, the officer testified that before he fired his gun, he saw McConnell point the gun at him and realized he was "looking down the barrel of the gun." This testimony provided some evidence to support the initial aggressor instruction. *See, e.g., Roberts-Bicking*, ¶¶ 34, 36 (The defendant was the initial aggressor when, after being confronted by the victims, he "brandished a pistol" and cursed because "merely *producing* the pistol during an argument was sufficient to warrant instructing the jury on initial aggressor principles."); *People v. Griffin*, 224 P.3d 292, 300 (Colo. App. 2009) (The defendant was the initial aggressor when, after engaging in a verbal altercation with the victim, she returned to the scene "with gun in hand."). The fact that McConnell presented a different version of the interaction or that the officer's testimony was sometimes inconsistent only means that the evidence supported both McConnell's claim that he acted in self-defense and the prosecution's claim that he was the initial aggressor. Under those circumstances, "the jury should be

provided with the self-defense instruction, including the initial aggressor exception, and be permitted to weigh the evidence to decide whether self-defense has been disproved" as an affirmative defense or proved as a traverse. *People v. Newell*, 2017 COA 27, ¶ 28; *Martinez v. People*, 2024 CO 48, ¶ 15 ("[S]elf-defense is a traverse to crimes involving reckless conduct . . . .").

¶ 21 Because, viewing the evidence in the light most favorable to the prosecution, there was some evidence to support giving the initial aggressor instruction, the trial court did not err by including that exception in the self-defense instructions.

### B. Prosecutor's Misstatement of the Law of Self-Defense

#### 1. Legal Principles and Standard of Review

¶ 22 In Colorado, a person has no duty to retreat before using force in self-defense — unless the person was the initial aggressor. *People v. Monroe*, 2020 CO 67, ¶ 19. Thus, unless the defendant was the initial aggressor, "the prosecution may not argue that [the] defendant is barred from acting in self-defense unless [he] first retreats from an encounter." *Id.* at ¶ 20.

¶ 23 Ordinarily, we review for an abuse of discretion a claim that the prosecutor committed misconduct by misstating the law or

misinterpreting for the jury how the law should be applied to the facts. *Id.* at ¶ 16. But where, as here, the defendant fails to object to the prosecutor's comments, we review the claim for plain error. *People v. Duncan*, 2023 COA 122, ¶ 33. "Only prosecutorial misconduct that is 'flagrantly, glaringly, or tremendously improper' warrants reversal under the plain error test." *Id.* (quoting *Hagos v. People*, 2012 CO 63, ¶ 14). In making this determination, we evaluate the allegedly improper comments in the context of the argument as a whole and in light of the evidence before the jury. *Id.* at ¶ 31.

### 2. Analysis

¶ 24 In recounting McConnell's actions on the morning of the robbery and shooting, the prosecutor told the jury that he would provide "a framework" so that the jury could "keep in [its] mind" "all the background information." That information included that McConnell "bought a mask," "got a gun," "took the license plate off of his car," "cased the gas station," "made threats" during the robbery, and "didn't listen." With respect to McConnell's failure to listen, the prosecutor argued as follows:

> And the final piece of the framework I want
> you all to keep in mind during these
> arguments and during your deliberations is
> that he didn't listen.  He had an opportunity to
> avoid everything else that you saw.  He had an
> opportunity to avoid being involved in a gun
> battle.  He had an opportunity to spare his
> two-year-old daughter . . . from being in the
> path of bullets.  But he did not listen.

¶ 25  McConnell contends that the prosecutor's "didn't listen" comments misstated the law by suggesting that he had a duty to retreat before he could exercise his right of self-defense.  We reject that contention for two reasons.

¶ 26  First, the comments, read in context, do not refer to McConnell's self-defense claim.  In our view, the prosecutor's comments were intended to emphasize McConnell's state of mind — that he deliberately committed the charged crimes and persisted in his criminal conduct despite an opportunity to disengage and give himself up.  That interpretation is consistent with the prosecutor's preceding statements about McConnell's careful preparation for the robbery and his intent to flee the scene despite the officer's presence and also with the lack of any specific reference to a duty to retreat.  At worst, the comments are ambiguous, in which case we

11

generally "accord prosecutors the benefit of the doubt." *People v. McMinn*, 2013 COA 94, ¶ 60.

¶ 27     Second, even if the comments were intended to imply a duty to retreat, they would not constitute a misstatement of the law. An initial aggressor *does* have a duty to retreat before using force in self-defense. *Monroe*, ¶ 19. And the prosecution's theory, based on evidence presented at trial, was that McConnell was the initial aggressor, which meant he had a duty to retreat. Under these circumstances, the prosecutor's comments were not improper. *See People v. Carter*, 2015 COA 24M-2, ¶ 71 ("During closing argument, a prosecutor has wide latitude and may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence.") (citation omitted).

¶ 28     In any case, even acknowledging some potential for confusion, we certainly cannot say that the prosecutor's comments were so flagrantly, glaringly, or tremendously improper that the court should have intervened sua sponte to strike them. *See Romero v. People*, 2017 CO 37, ¶ 6 ("To qualify as plain error, the error must

12

be one that 'is so clear-cut, so obvious,' a trial judge should be able to avoid it without benefit of objection.") (citation omitted).

## II.     Motion to Suppress

¶ 29     McConnell argues that the trial court erred by denying his motion to suppress statements made during his custodial interrogation.

### A.     Legal Principles and Standard of Review

¶ 30     The Fifth Amendment to the United States Constitution guarantees the right to counsel during a custodial interrogation. *Leyba v. People*, 2021 CO 54, ¶ 13; *accord Miranda v. Arizona*, 384 U.S. 436, 469 (1966).  When a suspect invokes the right to counsel, he is not subject to questioning until a lawyer is made available or he voluntarily reinitiates communication with police and validly waives his rights.  *Edwards v. Arizona*, 451 U.S. 477, 483-85 (1981).

¶ 31     To "actually invoke[] his right to counsel," *Smith v. Illinois*, 469 U.S. 91, 95 (1984), though, the suspect "must unambiguously request" a lawyer, *Davis v. United States*, 512 U.S. 452, 459 (1994). In other words, "a suspect's request must be sufficiently clear such that 'a reasonable police officer in the circumstances would

understand the statement to be a request for an attorney.'" *Leyba*, ¶ 13 (quoting *Davis*, 512 U.S. at 459). If a suspect's reference to an attorney is "ambiguous or equivocal in that a reasonable officer . . . would have understood only that the suspect *might* be invoking the right to counsel," police are not required to stop their questioning. *People v. Kutlak*, 2016 CO 1, ¶ 15 (quoting *Davis*, 512 U.S. at 459, 461-62).

¶ 32    When the interrogation is recorded, as it was here, and there are no relevant disputed facts outside the record, we are in just as good a position as the trial court to determine whether the defendant unambiguously invoked his right to counsel. *See People v. Springsted*, 2016 COA 188, ¶ 16. Thus, our review of the suppression ruling is de novo. *Id.* (when interrogation is recorded, appellate court decides voluntariness issue de novo). If we determine that the court erred, we apply the constitutional harmless error standard to assess the effect of the error. *See People v. Herold*, 2024 COA 53, ¶ 30. Under this standard, we will reverse unless the error was harmless beyond a reasonable doubt, meaning there is no reasonable possibility that it contributed to the conviction. *Margerum v. People*, 2019 CO 100, ¶ 14.

## B. Relevant Facts

¶ 33    After his arrest, McConnell was brought to the police station for an interview.  An officer obtained McConnell's consent to search his apartment then advised McConnell of his *Miranda* rights. Thereafter, the following exchange occurred:

> OFFICER: Now keeping these rights in mind, are you willing to waive these rights and talk to me about these incidents and kinda your whereabouts for today and stuff like that?
>
> McCONNELL: I don't want to waive my rights by no means, but I will talk to you.
>
> OFFICER: Okay, though, obviously you're in custody, right.  So, for me to ask you any questions any further, you have to agree to talk to me, and in doing so, you have to acknowledge your rights and waive those rights.
>
> McCONNELL: Well, if I'm in custody, I would like to have an attorney, but I'll talk to you.  I have no problem like talking to you.  Like, I don't . . . .  Like, I will tell you everything I can.
>
> OFFICER: I get that.
>
> McCONNELL: You know I don't want to —
>
> OFFICER: You understand your rights, right?
>
> McCONNELL: Yes, absolutely.
>
> OFFICER: And you can tell me, I don't want to talk to you.

15

McCONNELL: Right, and I'll talk to you. Like, I have no problem with that.

OFFICER: Okay. You know unfortunately the intel gathering that we have at this point is rather limited, okay? But you understand that if you talk to me, that anything can be used against you that you tell me?

McCONNELL: Yes, absolutely.

OFFICER: Okay, and understanding that, you're willing to talk to me without an attorney present? Is that what you're telling me?

McCONNELL: Yeah, if it gets to any point where I feel like something's up —

OFFICER: You can stop the interview anytime.

McCONNELL: Bingo.

OFFICER: You have the right to do that.

McCONNELL: Yes, I will talk to you. I'm willing to give you anything and everything to help you guys.

OFFICER: Okay.

McCONNELL: I'm not holding anything back.

OFFICER: You just don't want to sign saying that you waived your rights?

McCONNELL: Nope.

OFFICER: Okay.

16

## C.    Analysis

¶ 34    McConnell contends that he unambiguously invoked his right to counsel when he told the officer, "[I]f I'm in custody, I would like to have an attorney."

¶ 35    The problem is that, at the same time McConnell said he wanted an attorney, he told the officer, "[B]ut I'll talk to you." McConnell says the statement is not ambiguous because "an accused can get an attorney and still speak to officers about the investigation."  We agree that one reasonable interpretation of McConnell's statement is that he was willing to speak with officers but only with a lawyer present.  Another reasonable interpretation, though, is that he generally wanted the assistance of counsel, given that he had been arrested, but he was also willing to talk to the officer without a lawyer.

¶ 36    A statement is "ambiguous" when it is "open to more than one plausible interpretation," Black's Law Dictionary 100 (12th ed. 2024), or "capable of being understood in two or more possible senses or ways," Merriam-Webster Dictionary, https://perma.cc/G3LN-YUD3; *cf. People v. Lockett,* 2025 COA 1,

¶ 10 (Statutory language is ambiguous when it is "susceptible of more than one reasonable interpretation.").

¶ 37    A reasonable officer would have understood that McConnell *might* be invoking his right to counsel, but we cannot say that every reasonable officer would have understood the statement as a request to have a lawyer present during questioning.  In *Kutlak*, ¶ 4, for example, after the officer advised the defendant of his rights, the defendant responded, "I do have a lawyer. . . .  A personal lawyer. . . .  He's on retainer."  The defendant then asked, "[C]an we get him down here now, or . . . ?"  The supreme court concluded that the defendant's statements were ambiguous, as it was unclear "whether he was actually requesting his lawyer or whether he was simply exploring the logistics and timing of possibly securing counsel's presence during the interrogation." *Id.* at ¶ 27.  The court also noted that, moments later, the defendant confirmed he would speak to the officer, which "indicate[d] his conscious decision *not* to invoke his right to counsel." *Id.*

¶ 38    Here, too, McConnell mentioned an attorney but did not unambiguously state that he wanted one present during the interrogation.  And, moments later, he confirmed that he was

18

willing to talk "without an attorney present" and that he would stop the interview if he felt that "something [was] up."

¶ 39 But even if the trial court erred by admitting McConnell's statements at trial, we conclude that any error was harmless beyond a reasonable doubt. During the interrogation, McConnell confessed to robbing the convenience store and admitted to borrowing the gun from a friend. He expressed remorse about the shooting, but he told police that "one of the reasons that he fired back was to protect [his daughter]." McConnell also disclosed the location of the clothes he was wearing during the robbery and the cash he took from the register.

¶ 40 In determining whether any error in refusing to suppress McConnell's statement was harmless beyond a reasonable doubt, we consider the cumulative nature of the statement, the importance of the statement to the prosecution's case, and the overall strength of the evidence of the defendant's guilt. *See People v. Frye*, 2014 COA 141, ¶ 16.

¶ 41 At trial, the only contested issue was whether McConnell shot at the officer in self-defense. McConnell admitted that he robbed the convenience store at gunpoint and that he shot the officer. He

19

testified that he used a gun that he had borrowed from a friend and that he later disposed of the clothes he wore during the robbery. McConnell validly consented to a search of his home, where officers would have discovered the stolen money regardless of his confession. And the robbery and shooting were recorded on video and shown to the jury.

¶ 42    Given all this, we do not see how the admission of McConnell's inculpatory statements to police could possibly have prejudiced his defense. *See People v. Casias*, 2012 COA 117, ¶ 69 ("[T]he single most important factor" in assessing harmlessness is "whether the case was 'close.'") (citation omitted). In his opening brief, McConnell says that reversal is required "because the confession was essential to the prosecution's case and impacted defense counsel's trial strategy." But that single sentence does not help us formulate a theory of prejudice. We disagree that the confession was essential (the interview was not introduced at trial and the prosecutor barely mentioned it), and we are unsure how the statements affected trial strategy, in light of the overwhelming evidence that McConnell was the person with the gun at the gas station.

¶ 43    Accordingly, we conclude that any error in denying McConnell's motion to suppress was harmless beyond a reasonable doubt.

## III.    Restitution

¶ 44    The trial court ordered McConnell to pay approximately $62,000 in restitution.  McConnell contends that the court's order was untimely and must be vacated.  We conclude that this claim is waived.

### A.    Legal Principles and Standard of Review

¶ 45    Every order of conviction in a felony case "shall include consideration of restitution."  § 18-1.3-603(1), C.R.S. 2021.[1]  When the court enters an order that the defendant is obligated to pay restitution but defers fixing the amount, the final restitution order must be entered within ninety-one days unless the court finds good cause to extend the deadline.  § 18-1.3-603(1)(b); *People v. Weeks*, 2021 CO 75, ¶ 39.

---

[1] Section 18-1.3-603, C.R.S. 2021, was in effect when the restitution order was entered in this case.  Because the statute has since been amended, *see* Ch. 307, sec. 1, § 18-1.3-603(1)(b), (2)(a), 2025 Colo. Sess. Laws 1606-07, we refer to the 2021 version throughout this opinion.

¶ 46      Section 18-1.3-603(1)(b)'s ninety-one-day deadline is not jurisdictional, however, and, therefore, it can be waived. *Babcock v. People*, 2025 CO 26, ¶ 27. Waiver of a statutory right, like the one at issue here, "must be voluntary, but need not be knowing and intelligent." *People v. Roberson*, 2025 CO 30, ¶ 13 (quoting *Finney v. People*, 2014 CO 38, ¶ 16). And a defendant's statutory right may be waived by his counsel. *Id.*

¶ 47      A waiver can be explicit or implied. *Babcock*, ¶ 29. An implied waiver occurs "when a party engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion." *Roberson*, ¶ 13 (quoting *Finney*, ¶ 28).

¶ 48      "Waiver extinguishes error and therefore any appellate review." *Babcock*, ¶ 29. We review de novo whether a claim is waived. *Roberson*, ¶ 13.

### B.    Analysis

¶ 49      The court sentenced McConnell on June 22, 2021, but reserved ruling on the amount of restitution owed. Thus, it was required to enter a final restitution order by September 21, 2021. The court initially scheduled the restitution hearing for September 14, but the Department of Corrections (DOC) failed to bring

22

McConnell to the hearing, apparently because he had been transferred into federal custody. Defense counsel requested that the hearing be continued "for about four weeks" so that McConnell could be present. The court offered November 10, 2021, a date seven weeks after the deadline, and defense counsel accepted that date. At the rescheduled hearing on November 10, defense counsel argued that, pursuant to *Weeks,* which had been issued two days earlier, the trial court had missed the ninety-one-day deadline and could not order restitution.

¶ 50    Under the supreme court's recent restitution case law, defense counsel's request to continue, or even mere acquiescence in the continuance of, the restitution hearing beyond the statutory deadline was sufficient to waive a section 18-1.3-603(1)(b) timeliness claim. *Babcock,* ¶ 30; *Roberson,* ¶¶ 16-17.

¶ 51    Defense counsel in this case requested and accepted a hearing after the ninety-one day deadline. And even though the continuance was necessitated by the DOC's noncompliance with the writ, counsel's "failure to object to a hearing outside the statutory deadline" reflects "conduct that manifests an intent to relinquish a

23

right or privilege." *Roberson*, ¶ 17 (quoting *Forgette v. People*, 2023 CO 4, ¶ 28).

## IV.   Disposition

¶ 52   The judgment and order are affirmed.

JUDGE FOX and JUDGE SCHUTZ concur.