22CA1770 Peo v Watkins 07-31-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1770
Arapahoe County District Court No. 19CR1009
Honorable Joseph Whitfield, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cassidy Jean Watkins,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Harris and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 31, 2025

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Leah Scaduto, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     Defendant, Cassidy Jean Watkins, challenges her felony driving while ability impaired (DWAI) and child abuse convictions. We affirm.

## I.     Background

¶ 2     On April 3, 2019, an Aurora apartment property manager saw a gray car driving fast through the complex's parking lot before it almost hit two cars.  The manager called police and testified at trial that the driver, later identified as Watkins, yelled at the manager when she noticed he was on the phone and yelled at "whoever came close."  Watkins next opened the hood of the car and "smoke" came out; the manager then first noticed a child in the backseat.

¶ 3     Kristi Mason, the first officer to arrive, testified that she saw a car stopped in the "driveway" area of the parking lot before it "lurched forward real quick, slammed on their brakes, and whipped around the corner."  Mason followed and saw the car stop again, before it "lurched forward again, slammed on its brakes, turned, and then lurched forward" to reach a dead end in the parking lot. Mason watched as the car "effected a really bizarre turning pattern that was backing up, forward, backing up.  It ended up being like . . . a [ten], [twelve]-point turnaround."  The car eventually turned

1

around and very quickly "whip[ped]" into a parking spot between other cars.

¶ 4    Mason then approached the vehicle and Watkins, who had exited the vehicle. Mason testified that she asked Watkins if she had been drinking because Mason smelled "an alcoholic [odor] coming from [Watkins'] breath" and Watkins was acting "odd, and very exuberant, very high strung," "rambling," and not making "a lot of sense." Mason noted that a "sippy cup," two empty "Fireball shooter[s]," and a "glass pipe" were on the ground near the driver's side door. On body camera footage Watkins denied that these items were hers and said to "drug test [her]" before agreeing to field sobriety testing. Mason called for assistance from officers trained in driving under the influence (DUI) issues. According to Mason, Watkins continued to act "[b]izarrely. Just very animated, laughing. Just not appropriate for the situation at all."

¶ 5    Officer Brooke Mourey later arrived to begin a DUI investigation and noted that Watkins' eyes were slightly bloodshot or glossy, she was slightly slurring or was "thick-tongued," and Mourey smelled alcohol on Watkins' breath. Mourey also noted that

2

Watkins "was cooperative initially and then she started working herself up" and became "excited and angry."

¶ 6    Watkins' statements were inconsistent.  For example, Watkins initially denied drinking but then "[o]ne second she said she was drinking in her car before we made contact.  The next moment she said, no, she wasn't drinking in her car when I asked where the alcohol bottles were" before then stating she drank alcohol at home earlier that day.

¶ 7    Mourey asked Watkins if she would agree to undergo roadside testing, and she initially refused but then agreed.  Mourey began with a "horizontal gaze and nystagmus" eye test.  Instead of following a pen light with her eyes, Watkins "would automatically look to the side and then look back at the light" or "would then look down or look past," and Mourey could not conduct the test.  Mourey asked Watkins if she wanted to continue the roadside testing and Watkins refused, stating, "If I'm screwed, I'm screwed."  Mourey arrested Watkins and invoked the express consent statute, § 42-4-1301.1, C.R.S. 2024, to conduct further testing.  Watkins initially agreed to a breath test after her arrest, but refused after she was taken to jail.

3

¶ 8    The prosecution charged Watkins with DUI or DWAI as a fourth or subsequent offense, child abuse, and careless driving. The jury found Watkins guilty of DWAI and child abuse, but not guilty of careless driving. This appeal followed.

## II.    Issues on Appeal

¶ 9    Watkins raises five issues on appeal. First, she argues that there was insufficient evidence of her prior qualifying DUI/DWAI convictions to convict her of felony DWAI. Second, she contends that the district court erred by excluding lay witness testimony about her mental condition. Third, she contends the court erred by admitting evidence she asserts was irrelevant and prejudicial. Fourth, she argues the prosecution impermissibly lowered its burden of proof in closing arguments. Lastly, Watkins contends that even if individual errors do not merit reversal, she was cumulatively deprived of a fair trial.

¶ 10    Watkins argues that her felony DUI conviction should be vacated and replaced with misdemeanor DUI and that her convictions should be reversed. We affirm her convictions.

A. Sufficiency of the Evidence for Watkins' Prior DUI/DWAI Offenses

¶ 11    Watkins first argues that the prosecution failed to present sufficient evidence proving that she was previously convicted of three or more qualifying DUI/DWAI offenses. She contends that the evidence presented — court records and a Colorado Division of Motor Vehicles (DMV) report — failed to prove that Watkins was the person who committed the prior offenses. The prosecution contends that the evidence presented was sufficient, and that Watkins is essentially asking us to reweigh the evidence in her favor.

1. Standard of Review and Applicable Law

¶ 12    "When a defendant challenges the sufficiency of the evidence, he or she is asserting that the prosecution has not proven every fact necessary to establish the crime at issue, and thus, it has not established that the defendant, in fact, committed a crime." *McCoy v. People*, 2019 CO 44, ¶ 20. Regardless of whether a sufficiency claim was preserved, "[w]e review the record de novo to determine whether the evidence presented was sufficient in both quantity and quality to sustain a defendant's conviction." *Id.* at ¶¶ 27, 63.

¶ 13    To make this determination, reviewing courts apply the substantial evidence test to gauge "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Id.* at ¶ 63 (citation omitted).  However, "[a]n appellate court may not serve as a thirteenth juror and consider whether it might have reached a different conclusion than the jury.  Nor may an appellate court 'invade the province of the jury' by second-guessing any of the jury's findings that are supported by the evidence." *People v. Harrison,* 2020 CO 57, ¶ 33 (citations omitted).

¶ 14    Section 42-4-1301(1)(b), C.R.S. 2024, provides that "[a] person who drives a motor vehicle . . . while impaired by alcohol or by one or more drugs . . . commits [DWAI]. . . .  [I]t is a class 4 felony if the violation occurred after three or more prior convictions . . . for DUI, DUI per se, or DWAI."  Because "the legislature intended to include the fact of prior convictions as an element of the offense," the prosecution must prove beyond a reasonable doubt that a defendant has three or more qualifying convictions to obtain a

6

conviction for felony DWAI. *Linnebur v. People*, 2020 CO 79M, ¶¶ 2, 24, *overruled in part by People v. Crabtree*, 2024 CO 40M, ¶¶ 32-40.

¶ 15 To prove a defendant's identity, "the prosecution must establish an essential link between the prior conviction and the defendant. This . . . requires . . . present[ing] some documentary evidence combined with specific corroborating evidence of identification connecting the defendant to the prior felony conviction." *Gorostieta v. People*, 2022 CO 41, ¶ 2. The "types of corroborating evidence that a prosecutor might seek to introduce vary widely" and may include, but are not limited to,

> (1) evidence specifically identifying the defendant; (2) unique identifiers such as a driver license, prison identification number, or social security number; (3) photographs or fingerprints from the prior case that link that case to the current defendant; (4) a physical description from the prior case that can be compared to the defendant in the present case; (5) distinguishable features of the defendant such as tattoos; or (6) testimony of probation officers or others with personal knowledge positively identifying the defendant as being the same person who had previously been convicted.

7

*Id.* at ¶ 27.  That said, however, "the mere fact that the defendants in the present and prior cases have the same name and date of birth, *without more*, will generally be insufficient."  *Id.* at ¶ 28.

## 2.    Analysis

¶ 16    To prove that Watkins had three prior DUI/DWAI convictions, the prosecution first admitted a certified copy of Watkins' DMV driving record.  The driving record indicated that Watkins was convicted of (1) DWAI on May 23, 2006, in Adams County; (2) DUI on January 28, 2009, in Denver; and (3) DWAI on September 6, 2011, in Denver.  The driving record provided Watkins' full name (Cassidy Jean Watkins), a picture, a fingerprint, a physical description matching Watkins' appearance, and an Aurora address. The driving record redacted Watkins' date of birth (DOB), but the DMV record custodian's certificate provided her DOB — which matched the North Dakota driver's license that Watkins provided to police before her arrest — and stated that "[a] search of our records has revealed that this is the only subject with this name and [DOB]."  For all three listed convictions the prosecution admitted supporting court records that largely corresponded with the DMV driving record.

¶ 17    For the first DWAI conviction in 2006, the prosecution admitted an Adams County sentencing order showing Watkins was convicted of DWAI. The order identified Watkins by her full name and a DOB matching her North Dakota license, though the order was dated May 31, 2007. But an additional court document related to the 2006 DWAI conviction had the same case number as the sentencing order (003369), had Watkins' full name and matching DOB, and showed the sentence date as May 23, 2006, matching the driving record. The additional document also came from Adams County, provided a ticket number (2494492) and violation date (August 23, 2005), and a physical description of Watkins, all matching the driving record.

¶ 18    For the second 2009 DUI conviction the prosecution introduced a court document showing that Watkins was convicted of DUI (with a prior DWAI) for a violation on April 23, 2008, (matching the violation date in the driving record for Watkins' second conviction) and identifying her as Cassidy J. Watkins with a matching DOB. The case number in the court document also matched the violation number in the driving record (08M07391).

¶ 19    For Watkins' third conviction the prosecution admitted a court document showing that Watkins was convicted of DWAI (as a third subsequent offense) for a violation on July 15, 2011, matching the violation date in the driving record.  The document identified her as Cassidy J. Watkins with her matching DOB, and the case number in the document matched the violation number in the driving record (11M07618).

¶ 20    Generally, the supporting court documents all corroborate the DMV driving record.  But Watkins' home address in her driving record never matched the court records, which were different for each conviction, as were her listed phone numbers.

¶ 21    Giving the prosecution the benefit of every reasonable inference, *McCoy*, ¶ 63, we conclude that the prosecution admitted sufficient evidence for a jury to reasonably conclude that Watkins had three prior qualifying DWAI/DUI convictions.  It is true, as Watkins points out, that some of the information in the driving record and the court documents for each offense is inconsistent — namely, the addresses and phone numbers.  Only the court documents from the 2006 conviction contained a physical description of the defendant, and none included fingerprints to

compare to the driving record. But most of the information in the court documents and the driving record supported that Watkins was the individual who committed the various offenses. *See People v. Burdette*, 2024 COA 38, ¶¶ 56-59 (In finding the prosecution's admitted DMV record evidence and court records were sufficient for a jury to find that the defendant committed felony DUI, the court noted that, "[w]hile the court records did not precisely match the DMV records in all respects, the major details generally synced up.").

¶ 22    Each court document identified Watkins by name (although sometimes with a middle initial) and included a DOB that matched the North Dakota license she provided to police. And the DMV record custodian's certificate attested that there were no other records for an individual with Watkins' name and DOB. Further, there was more information in the documentary evidence than just Watkins' name and DOB. And each violation in the driving record corresponded to the case numbers or a violation number in the court documents.

¶ 23    Furthermore, the later court documents indicated that the defendant had prior DUI/DWAI offenses, with the 2009 conviction

11

noting the defendant had a prior DWAI conviction and the 2011 conviction detailing that it was a third offense. The driving record also contained a photograph of Watkins the jury could view and compare to her appearance in court. Lastly, aside from the date from the first court record associated with the 2006 conviction (which linked to another document with a matching date), nothing in the court records or driving record provided conflicting information that might raise doubts that they were associated with Watkins.

¶ 24    In sum, the prosecution provided sufficient documentary and corroborating evidence for a jury to reasonably link Watkins to the three prior convictions, as required to convict her of felony DWAI. *See Gorostieta*, ¶¶ 2, 27; *see also Burdette*, ¶¶ 56-59. We therefore affirm Watkins' felony DWAI conviction.

## B.    Lay Mental Condition Evidence

¶ 25    Watkins next challenges the court's decision to exclude lay witness testimony concerning her mental condition. She contends that the evidence was admissible under CRE 701 and section 16-8-109, C.R.S. 2024, without requiring her to plead not guilty by reason of insanity (NGRI). She argues the evidence's exclusion

prevented her from arguing that a mental condition (bipolar disorder) — not intoxication — explained her erratic behavior at the time of her arrest. The prosecution responds that the court allowed much of the evidence Watkins sought to admit, minimal evidence was properly excluded, and any error was harmless.

### 1. Additional Background

¶ 26 Watkins endorsed two lay witnesses ahead of trial, Matt Martin and Daniel Toquero. A prosecution investigator spoke with Toquero (he could not reach Martin), and Toquero said that he planned to testify at trial that he knew Watkins "was not taking medication. After the incident she started taking her medication again . . . [and] her behavior" was different; she was not "as hyperactive." The prosecution moved to preclude Martin and Toquero from testifying, arguing that they were unqualified to testify to Watkins' mental health diagnoses, treatment, and medical history.

¶ 27 Defense counsel responded that Watkins' "mental condition and behavior is relevant to explain her behavior on the night of the alleged offenses and to rebut the assertion that she was under the influence." Counsel added that "testimony regarding what Ms.

Watkins is like with and without medication and what Ms. Watkins'

'hyperactivity' looks like is relevant to explaining how her behavior

on the date of offense is consistent with the manifestations of her

mental condition generally as opposed to intoxication." Counsel

explained that Watkins was not pursuing an NGRI plea, and that

section 16-8-109 permitted her "to call lay witnesses to testify as to

their observations of Ms. Watkins' actions and conduct, and to

conversations with Ms. Watkins bearing upon her mental

condition." Counsel also clarified that Watkins was not seeking to

admit "testimony regarding a specific diagnosis or any other

testimony which would require scientific, technical, or other

specialized knowledge."

¶ 28    Section 16-8-109 provides,

> In any trial or hearing in which the mental
> condition of the defendant is an issue,
> witnesses not specially trained in psychiatry or
> psychology may testify as to their observation
> of the defendant's actions and conduct, and as
> to conversations which they have had with him
> bearing upon his mental condition, and they
> shall be permitted to give their opinions or

> conclusions concerning the mental condition
> of the defendant.[1]

The court found that section 16-8-109 did not apply. It reasoned that while this provision on its face would permit the testimony Watkins sought to admit, its context in article 8 of title 16 — which deals with insanity — indicated that it only comes into play when a defendant's sanity or mental condition is at issue as a formal defense. But the court declined to exclude all of Watkins' lay witness testimony outright, excluding only "testimony about the effects of the defendant's medications or any mental health diagnosis" offered without proper foundation and notice.

¶ 29 Defense counsel later asked for clarification of this ruling and objected to the court's interpretation of section 16-8-109. The court clarified that it "denied the People's request to exclude the particular witness['] . . . testimony outright . . . [and] did not restrict

---

[1] Section 16-8-109, C.R.S. 2024, and other provisions in title 16, article 8, were amended by the Colorado legislature in 2025 with the changes set to go into effect on August 6, 2025. Ch. 15, secs. 15, 28, § 16-8-109, 2025 Colo. Sess. Laws 50, 59. Unless otherwise noted, this opinion refers to the version of section 16-8-109 in effect at the time of Watkins' offense and trial. The version of the statute in effect then and the amended version are substantively the same however. *See id.* at 50.

the defense . . . from [presenting] those witnesses." The court

further allowed Watkins to submit an offer of proof under seal to

determine what testimony it would permit.

¶ 30    Watkins' offer of proof explained that she sought to admit the

following testimony from Martin:

> 1. The defense may call defense-endorsed witness, Matt Martin.
>
> 2. Mr. Martin has known Ms. Watkins for seven years and was previously [Ms. Watkins' roommate].
>
> 3. Mr. Martin was speaking to Ms. Watkins daily or weekly and was in contact with Ms. Watkins on the date of the alleged offense in this case.
>
> 4. Mr. Martin has observed Ms. Watkins both intoxicated and sober.
>
> 5. Mr. Martin knows Ms. Watkins to have a mental condition.
>
> 6. Mr. Martin has observed Ms. Watkins both on and off medication.
>
> 7. When Ms. Watkins[] is off-medication, Mr. Martin has observed Ms. Watkins to be more talkative, hyper, off-topic, and manic.
>
> 8. Mr. Martin has observed Ms. Watkins to act in this manner while sober on numerous occasions.

¶ 31    After reviewing the offer of proof, the court again found that

section 16-8-109 did not allow for the admission of all of Martin's

lay testimony evidence.  The court noted that Watkins had not

pleaded a mental condition defense, and the statute's context in the

insanity statutes did not allow for the admission of the proffered

evidence when Watkins' mental condition or sanity was not at

issue.  But the court added that "[o]bservations that comport with

the normal rules [of evidence]" would be admissible.  "So a person

saying, for example, . . . I've known Ms. Watkins for five years and

. . . I've seen her when she's intoxicated, I've seen her when she's

sober, I know what she looks like . . . that's not excluded" because

this testimony would be based on a witness' personal knowledge.

The issue of medications specifically was murkier, with the court

explaining that testimony about Watkins' medications and mental

diagnoses would generally not be admissible, but some limited

testimony could be admissible depending on "if the witness could actually say it's medications."[2]

¶ 32     Martin testified that he was Watkins' former roommate and that they had "hung out together" for "seven plus years" and that around April 2019 he had seen or spoken with Watkins almost daily.  Martin testified that Watkins had asked for help the day of her arrest because her car was experiencing mechanical issues, but when he arrived she was gone.  Martin also testified that he had seen Watkins when she was sober and intoxicated; and when he was asked, "Without going into what they are or what they are for, have you seen her take pills before," Martin said, "Yes.  I have."  The defense then asked, "Is there a difference in her behavior when she does not take those pills from when she does?"  The prosecution objected.  The court allowed the question while cautioning that the defense could not introduce evidence through a lay witness concerning medications, diagnoses, or treatment.

---

[2] Watkins filed a petition pursuant to C.A.R. 21 with the Colorado Supreme Court for review of the issue.  The Supreme Court initially ordered a rule to show cause but later reversed this decision, noting that the rule to show cause was granted "improvidently" and returned jurisdiction to the district court.

¶ 33   Martin then responded that when Watkins did not take her pills she was "[j]ust more talkative, . . . off the wall [and] . . . bouncing around in the conversation." Martin added that Watkins was like this when she was sober and she did not seem intoxicated over the phone the day of the arrest, "[j]ust stressed out and upset." Finally, Martin testified that he did not know if she had taken her pills that day.

### 2.   Standard of Review and Applicable Law

¶ 34   "We review a trial court's exclusion of evidence for an abuse of discretion." *People v. Johnson*, 2019 COA 159, ¶ 35, *aff'd*, 2021 CO 35. "A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding of the law." *People v. Day*, 2023 COA 115, ¶ 14 (*cert. granted in part* Dec. 23, 2024). And because this issue was preserved but the alleged error did not entirely foreclose Watkins from presenting her mental condition defense at trial, we review it for nonconstitutional harmless error. *Johnson*, ¶ 35; *see also Hagos v. People*, 2012 CO 63, ¶ 12. Under this standard, "we reverse if the error 'substantially influenced the verdict or affected

the fairness of the trial proceedings.'" *Hagos*, ¶ 12 (citation omitted).

¶ 35    "Unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible." *People v. Salazar*, 2012 CO 20, ¶ 16.  But "the right to present a defense is not absolute; the Constitution requires only that the accused be permitted to introduce all relevant and admissible evidence." *Id.* at ¶ 17. Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  CRE 403.

¶ 36    Lay witnesses may testify to "opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  CRE 701. "[T]he critical factor in distinguishing between lay and expert testimony is the basis for the witness's opinion." *Venalonzo v. People*, 2017 CO 9, ¶ 22.  "Expert testimony . . . goes beyond the

realm of common experience and requires experience, skills, or knowledge that the ordinary person would not have." *Id.*

### 3.    Analysis

¶ 37    We need not decide whether the district court erred by excluding Watkins' proffered testimony on the grounds that section 16-8-109 required her to plead NGRI or impaired mental condition because, even assuming without deciding that this was error, most of Martin's proffered testimony *was* admitted — and the remaining testimony would have been impermissible expert testimony by a lay witness barred by CRE 701. *See People v. Dyer*, 2019 COA 161, ¶ 39 ("[A]n appellate court may affirm a lower court's decision on any ground supported by the record, whether relied upon or even considered by the trial court."). Any assumed error was therefore harmless because it did not substantially influence the verdict or affect the fairness of the trial, so it does not merit reversal. *See Hagos*, ¶ 12.

¶ 38    On appeal Watkins argues she was harmed because she was unable to introduce evidence that she "(1) had a mental condition for which she took medication, (2) was off her medication on the date of offense, and (3) that her behavior on video was consistent

21

with how she acts while sober and off her medication." As detailed in the offer of proof, Watkins proposed to have Martin testify that he knew Watkins had a "mental condition," that she took "medication," and that without this medication she was "more talkative, hyper, off-topic, and manic." Watkins concedes that she "did not seek to introduce her bipolar disorder diagnosis."

¶ 39     As a lay witness Martin properly testified that (1) he knew Watkins for years and spoke to her almost daily; (2) he had seen her sober and intoxicated; (3) he saw her take "pills" that affect her behavior; (4) without these pills she was more "talkative" and "bounc[ed]" around in conversations; (5) she was like this when she was sober; (6) she did not seem intoxicated when he spoke with her on the phone the day of her arrest, "[j]ust stressed and upset"; and (7) he was unaware if she took her pills that day. Watkins was able to introduce nearly everything in her offer of proof, except that Watkins had a "mental condition" and took "medication" rather than "pills."

¶ 40     Martin could, and did, testify to behavior he personally observed, but as a lay witness he could not have speculated as to what mental condition afflicted Watkins. Such testimony would

have clearly been expert testimony requiring specialized knowledge. *See* CRE 701; *see also Dunlap v. People*, 173 P.3d 1054, 1098 (Colo. 2007) (allowing a lay witness to testify to a defendant's specific diagnosis "could only be considered expert opinions under the rules of evidence" and was inadmissible via section 16-8-109).

¶ 41    Admitting this testimony through Martin would have introduced an unverifiable possibility that Watkins had an unnamed mental condition without any means to determine (1) whether Watkins was actually diagnosed with a specific condition and (2) the importance of such a diagnosis.[3]  Martin certainly could not have answered such questions on cross-examination, leaving the jury to speculate.  *See People v. Gonzales*, 666 P.2d 123, 128 (Colo. 1983) ("[V]erdicts in criminal cases may not be based on 'guessing, speculation or conjecture.'") (citation omitted).

¶ 42    To discuss whether she had a mental condition, how her proposed mental conditions affected her, or what medication she

---

[3] We do not comment on the potential veracity of Watkins' claims concerning her mental health or potential diagnoses.  We merely emphasize that, as a lay witness, Martin was not properly able to opine on these issues without expert knowledge.

was taking to manage this, Watkins needed expert testimony. *See Venalonzo*, ¶ 22; CRE 701, 702. And while Watkins would have preferred the term "medication" over "pill," Martin's testimony conveyed what Watkins sought to elicit at trial — she regularly took *something* that made her less talkative and more focused in conversations, and it was unclear whether she had taken such pills that day. The jury had all the information that Martin could provide.

¶ 43 So, even assuming without deciding that the district court erred by excluding the proffered testimony under section 16-8-109, (1) most of Martin's testimony was admitted and (2) what was excluded was expert testimony per CRE 701 and 702. Any assumed error was therefore harmless and does not warrant reversal. *See Hagos*, ¶ 12.

C. Irrelevant and Prejudicial Evidence

¶ 44 Watkins next contends that the district court erred by admitting irrelevant and prejudicial evidence: (1) Mourey's testimony that she believed she had enough evidence to invoke the express consent statute and the "screening process"; (2) bodycam footage of Watkins receiving a *Miranda v. Arizona,* 384 U.S. 436

24

(1966), advisement, thus violating her right to remain silent; (3) statements about officers' concerns for Watkins' child; and (4) Watkins' statements that she was being persecuted for being white. Watkins preserved each claim and argues the claims warrant reversal. We address each contention in turn but conclude the court did not err.

¶ 45     "In order to be admissible, evidence must be relevant; and unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible." *People v. Rath*, 44 P.3d 1033, 1038 (Colo. 2002). And "[e]vidence is relevant, in the logical sense, as long as it . . . [tends] [']to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting CRE 401).

¶ 46     "Colorado Rule of Evidence 403 strongly favors the admission of relevant evidence, so the evidence should be given its maximum probative value and minimum prejudicial effect. Evidence is unfairly prejudicial where it introduces into the trial considerations extraneous to the merits, such as bias, sympathy, anger, or shock." *People v. Greenlee*, 200 P.3d 363, 367 (Colo. 2009) (citation

25

omitted), *overruled on other grounds by Rojas v. People*, 2022 CO 8, ¶ 4; *see also People v. Robinson*, 908 P.2d 1152, 1156 (Colo. App. 1995), *aff'd*, 927 P.2d 381 (Colo. 1996).

¶ 47    "The trial court has considerable discretion to determine the relevancy, admissibility, probative value, and prejudicial impact of evidence." *People v. Cordova*, 293 P.3d 114, 118 (Colo. App. 2011).

> A trial court's decision to admit evidence is reviewed for abuse of discretion and will be disturbed on appeal only if it was manifestly arbitrary, unreasonable, or unfair. When the defense properly objects to the admission of evidence, harmless error review applies, and reversal is required if the error affects the defendant's substantial rights.

*Perez v. People*, 2015 CO 45, ¶ 22 (citation omitted).

### 1.    Express Consent and the Screening Process

#### a.    Additional Background

¶ 48    Before trial, Watkins moved to exclude officer testimony concerning express consent, Watkins' refusal of the breath test, and discussions of probable cause. Watkins argued this testimony would impermissibly imply that, because of a pretrial "screening process," "only guilty parties are charged with crimes and thus the defendant must be guilty." Watkins argued such testimony was

irrelevant and prejudicial. The prosecution argued testimony showing that officers established probable cause was relevant because "it's important for the jury to understand the progress of the [DUI investigation] . . . and why . . . Ms. Watkins was under the obligation to take this [breath] test" after officers invoked express consent.

¶ 49 The court admitted the testimony, explaining that, "[i]n a DUI case, the establishment of probable cause plays somewhat of a different role than it would for other types of charges. And that's primarily based on the fact that in a DUI case you have to establish probable cause in order to invoke Express Consent." Thus, while probable cause testimony would normally be irrelevant, in a DUI case evidence concerning officers' investigation and the decision to invoke express consent is "part of the evidence." The court ruled that officers could testify "about what they observed and what that evidence shows and, based on that information, what did they do next," but it warned that if the prosecution needed to discuss the probable cause standard it would need to be careful.

¶ 50    During trial probable cause and express consent came up several times.  During voir dire the prosecution explained express consent, over Watkins' objection, stating,

> In Colorado, any person who chooses to drive on our roads gives their consent to submit to a blood or a breath test if an officer has probable cause . . . to believe that the person is driving under the influence or driving while ability impaired.  So what that means is, they can't just . . . ask a random person to submit to a blood or breath test.  But when that happens, they can ask — the person . . . whether they will take a blood or a breath test.

¶ 51    Watkins later objected to bodycam footage in which Mourey opined that Watkins was intoxicated, arguing this impermissibly allowed Mourey to opine about Watkins' guilt.  The court overruled the objection.  The court distinguished the DUI context from the situation in *People v. Mendenhall*, 2015 COA 107M, ¶ 63, where an "investigator's statements regarding how many potential cases he received each year and in how many of those cases charges were brought constituted inadmissible evidence" because a jury needed to be able to understand a DUI officer's investigative process.

¶ 52    Mourey testified that when conducting a DUI investigation, "[f]irst, I want to determine if there is impairment.  And if there is

28

impairment, then I'm going to make an arrest." Mourey then testified about the "stages" of a DUI investigation. Testifying to Watkins' arrest specifically, Mourey explained that after Watkins refused to conduct field sobriety testing Mourey was unable to "rule out" intoxication. Based on the totality of the evidence, including the items near the car, the odor of alcohol, Watkins' "glassy eyes" and inconsistent statements, and the refusal to conduct the roadside tests, Mourey arrested Watkins and "invoked Express Consent."

¶ 53    Finally, the jury received an instruction on express consent noting that anyone who drives a motor vehicle in Colorado may be required to complete a breath or blood test to determine drug or alcohol impairment when requested by a "law enforcement officer having probable cause to believe that the person was driving a motor vehicle" while intoxicated. The instruction added that the jury could consider Watkins' refusal to conduct a breath test as evidence of DUI or DWAI.

b.    Analysis

¶ 54    Section 42-4-1301.1(1) and (2)(a)(I) provides that all drivers in Colorado expressly consent to

29

take and complete, and to cooperate in the taking and completing of, any test or tests of the person's breath or blood for the purpose of determining the alcoholic content of the person's blood or breath when so requested and directed by a law enforcement officer having probable cause to believe that the person was driving a motor vehicle in violation of the prohibitions against [DUI or DWAI].

A driver may typically choose between a blood or breath test, or may refuse testing. *People v. Montoya*, 2024 CO 20, ¶¶ 22, 24. "In the administrative context, the price of refusal is revocation of the driving privilege." *Id.* at ¶ 23. "But in a criminal trial, . . . a refusal is admissible because it may provide circumstantial evidence that the driver knew (or at least suspected) that taking the test would produce incriminating evidence of guilt." *Id.* at ¶¶ 27, 32 ("A driver's refusal to submit to testing is also probative because it may suggest consciousness of guilt.").

¶ 55    "When probable cause to charge a defendant is not at issue . . . the prosecution's presentation of evidence about charging decisions may imply that, because of a pretrial screening process, only guilty parties are charged with crimes and thus the defendant must be guilty." *Mendenhall*, ¶ 62. Such "screening process" testimony is prohibited because it "hint[s] that additional evidence

30

supporting guilt exists that is unknown to the jury, and also reveal[s] the personal opinion of the witness" as to guilt. *Id.*; *see also Domingo-Gomez v. People*, 125 P.3d 1043, 1052-53 (Colo. 2005).

¶ 56    Yet "in some circumstances, police officers may testify about the reasons they took certain investigative steps, even where this testimony touches upon prohibited subjects." *People v. Penn*, 2016 CO 32, ¶ 32. *Compare id.* at ¶¶ 25, 33 (officer's testimony, "I had reason to arrest him for a crime that had been committed," was not plain error because it merely "provided context for his action and simply explained, as a factual matter, why he called [the defendant] as the next step in his investigation"), *and Davis v. People*, 2013 CO 57, ¶ 22 ("[D]etectives' testimony did not constitute an improper credibility opinion . . . because it was offered to provide context for the detectives' interrogation tactics and investigative decisions . . . ."), *with People v. Mullins*, 104 P.3d 299, 301 (Colo. App. 2004) (plain error for an officer to testify about probable cause and the warrant's issuance because "[t]he facts that the police believed they had enough evidence and that a judge found there

was probable cause to arrest defendant had no rational tendency to prove that defendant committed" the charged crimes).

¶ 57 In this case, as the district court noted, officers' discussion of probable cause in the DUI/DWAI context is a unique situation. To invoke express consent, law enforcement officers *must* conclude they have probable cause to do so as part of their investigation, in accordance with section 42-4-1301.1(1) and (2)(a)(I), and as accurately explained in the jury's instructions.

¶ 58 Whether probable cause exists to invoke express consent does not establish the defendant's guilt, but it is relevant testimony needed to explain the investigation. *See Penn*, ¶¶ 25, 32, 33; *see also Davis*, ¶ 22. Given the law on express consent and the corresponding jury instruction, had Mourey not testified to whether she had a basis to invoke express consent the jury would have been forced to speculate as to whether Mourey believed probable cause existed.

¶ 59 Furthermore, the prosecution did not offer this testimony to prove that Watkins committed DUI or DWAI, nor did it suggest that Mourey's invocation of express consent meant that Watkins was guilty. *See Mendenhall*, ¶ 62. Mourey testified to what a DUI/DWAI

investigation entails, the relevant legal standard, and what she observed to justify invoking express consent. These investigative steps and observations were permissible in this context. *See Penn,* ¶¶ 25, 32, 33. The district court did not err by admitting this testimony.

### 2. Watkins' *Miranda* Advisement

¶ 60 Next, Watkins contends that the court erred by admitting bodycam footage of her *Miranda* advisement, which she argues violated her constitutional right to remain silent. Watkins says the footage was irrelevant and "its only purpose was to imply that [she] invoked her right to remain silent." She adds that showing her *Miranda* advisement before she refused the breath test allowed the prosecution to tie these actions together and indirectly use Watkins' silence as evidence of guilt.

¶ 61 The prosecution responds that under section 42-4-1301(6)(d), a defendant may not invoke the privilege against self-incrimination to block evidence of a refusal to complete or cooperate with testing. Given that Watkins referenced *Miranda* when refusing breath testing, the video of her *Miranda* advisement was relevant. Further,

the prosecution contends it never encouraged the jury to find that Watkins was guilty because she invoked her right to remain silent.

### a. Additional Background

¶ 62 The challenged footage shows Watkins in jail after her arrest and opens with Watkins being read her *Miranda* rights, which Watkins says she understands, before the officer asks, "So do you still want to talk to me about certain things?" and Watkins says "yeah." The video then cuts to Watkins being led by Mourey to speak to another officer, who attempts to confirm that Watkins agreed to conduct a breath test. Watkins responds, "No, I refuse to do it."

¶ 63 After confirming her decision, Watkins explains to Mourey that she is refusing the test in part because she was provided her *Miranda* rights. Mourey then explains the potential consequences of refusal, including the revocation of Watkins' license and the installation of a breath monitoring device in her car, and Watkins again refuses testing. The video then cuts again and ends with Watkins requesting "just a drug test."

¶ 64 Before trial, Watkins objected to the admission of the first portion of the video. The prosecution argued that juries expect to

see a *Miranda* advisement as part of an investigation, and it was not commenting on Watkins' choice to remain silent.

¶ 65 The court ruled that based on Watkins refusing a test the video was not a comment on Watkins' right to remain silent. There was no violation because the footage was "just a plain body-worn camera of a defendant who is *Mirandized* and speaks to law enforcement. . . . Just the . . . general fact that someone is *Mirandized* on video is not a commentary on [Watkins'] right [to remain silent.]" The court added that the video's relevance was to rebut the contentions that "law enforcement didn't take the proper steps," "jumped to conclusions," or "made assumptions," and to explain that a *Miranda* advisement is part of the investigatory process.

b. Analysis

¶ 66 "It is well established that 'the prosecution may not refer to a defendant's exercise of h[er] Fifth Amendment right to remain silent in the face of accusation.'" *People v. Burnell*, 2019 COA 142, ¶ 45 (quoting *People v. Key*, 522 P.2d 719, 720 (Colo. 1974)). But "[r]eversal is only required where the prosecutor's comment on the defendant's exercise of the right creates an inference of guilt or

35

where the prosecutor argues that the defendant's silence constituted an implied admission of guilt." *Id.* at ¶¶ 45-50 (that a "prosecutor stated that [the defendant] answered several questions, and then chose to exercise his right to remain silent" was misconduct, but it did not warrant a mistrial because it was brief and not detailed, and the court issued a curative instruction). Because Watkins preserved this issue, we review it de novo for constitutional harmless error. *See People v. Gallegos*, 2023 COA 47, ¶ 88, *aff'd*, 2025 CO 41.

¶ 67    Because the jury could consider Watkins' refusal to conduct testing, *Montoya*, ¶¶ 27, 32, the *Miranda* advisement — which she relied on as her reason for refusing testing — had some relevance that was not substantially outweighed by improper considerations in violation of CRE 403.

¶ 68    Even assuming it was error to admit the challenged portion of the footage, any error was harmless. That the jury saw Watkins' *Miranda* advisement does not equate to an improper comment on her right to remain silent. Despite Watkins' contention otherwise, the prosecution made no comments that created an "inference of guilt" or "an implied admission of guilt." *Burnell*, ¶ 45. Indeed,

Watkins *agreed* to speak to police — waiver of her *Miranda* rights is not contested on appeal — so it is unclear how her later refusal to cooperate with testing or her statements on the video implicate her right to remain silent. *See People v. Cuellar*, 2023 COA 20, ¶ 49 (In rejecting an undeveloped argument, "we are unaware of . . . any Colorado case holding that a reference to an officer's provision of a *Miranda* warning to the defendant, without more, violates the defendant's right against self-incrimination.").

¶ 69    The court did not err by admitting the footage, and even if this was error, it was harmless. *See Burnell*, ¶ 45.

3.    Officers' Statements About Watkins' Child

¶ 70    Next, Watkins argues that the court erred by admitting bodycam footage showing officers' statements concerning the safety of Watkins' daughter who was in the backseat of her car. Watkins contends the statements were irrelevant and overly prejudicial because the prosecution "implied that [she] was a bad mother" and inflamed the jury's passions against her. The prosecution responds that (1) the child's presence in the car was relevant to the child abuse charge, and (2) Watkins' conflicting statements about whether someone could pick up the child were relevant for the

DWAI or DUI charge because they demonstrated her inconsistent statements and behavior.

a. Additional Background

¶ 71     During Watkins' arrest police officers raised concerns about her child. The bodycam footage shows that after Watkins was arrested, she asked to call her mother, and Mourey said, "Yeah. Because we need somebody to come pick the child up, is she nearby?" Mourey added, "[W]e don't like people drinking and driving on these roads, especially with a child in the car." Mourey suggested that a family member pick up her child rather than social services, but Watkins said she had "no one to help." Eventually, officers were able to contact Watkins' mother, and she agreed to pick up the child.

¶ 72     Before trial, Watkins objected to mentions of her child in the backseat. But the court found that the statements were not unfairly prejudicial and were relevant to the charges. Moreover, instructions to the jury to consider each charge separately would remedy any prejudice. The court excluded part of the video where Mourey noted that having social services take the child would be "more traumatizing to the child."

## b. Analysis

¶ 73    The court did not err by admitting the challenged footage because the statements were relevant and were not substantially outweighed by the risk of unfair prejudice. *See Greenlee*, 200 P.3d at 367; *see also Robinson*, 908 P.2d at 1156.

¶ 74    Watkins' and the officers' statements concerning the child revealed that the child was in the car while Watkins was driving, and the child would have been endangered again if Watkins continued to drive while intoxicated. *See* § 18-6-401(1)(a), C.R.S. 2024 ("A person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health . . . ."). Further, as the prosecution notes, Watkins' conflicting statements were relevant for the intoxication charge because they showed her behavior at the time of her arrest, providing circumstantial evidence of intoxication. *See* § 42-4-1301(1)(f), (1)(g) (defining DUI and DWAI). And while the expressions of concern for the child could have been prejudicial, none of the challenged statements were so prejudicial as to improperly inflame the jury's passions. *Greenlee*, 200 P.3d at 367;

CRE 403. As a result, the court did not abuse its broad discretion by admitting the footage. *See Perez*, ¶ 22.

4. Watkins' Statements About Persecution for Being White

¶ 75 Watkins next contends that the court erred by admitting bodycam footage showing Watkins' statements alleging that she was being persecuted for being white and accusations that apartment complex residents hated her "for being white." Watkins concedes that these "rambling, illogical statements" might show intoxication (though she contested this and offered her mental condition as her explanation), but she argues other evidence could have conveyed this point. And she argues that, while potentially relevant, the statements' relevance was substantially outweighed by the risk of unfair prejudice because of the strong feelings her statements could invoke in the jurors. The prosecution responds that the statements were relevant to show Watkins' "strange and illogical behavior" and were sufficiently probative of Watkins' intoxication.

a. Additional Background

¶ 76 While interacting with the officers before her arrest Watkins explained she was in the area to return items to her ex-boyfriend (who was not home), but the community disliked her and, because

she was white, "basically I'm not allowed in this area . . . this is Mexican owned now . . . so just because I'm white when I come through they will call the cops on me."[4]  She later stated again that she believed she was targeted for being white, that she "wasn't dirty enough for them," and that the apartment manager would lie to police because he "will flag anybody who is not from the cartel." Watkins added that she could not get an apartment in the building because she was not a "prostitute," did not "sell drugs," and was "the minority here . . . [and they] treated [her] like shit" because she was white.

¶ 77    Pretrial Watkins moved to exclude these, and similar, statements because they were overly prejudicial, while the prosecution argued they were relevant to show Watkins' "nonsensical and illogical responses and demeanor in her responses to police questioning."  The court found the statements to be more probative than prejudicial and allowed them.

---

[4] Watkins made other similar statements throughout her interactions with police.  We have excerpted some of her statements here to illustrate the main point of these statements as relevant for the issue on appeal.

## b.  Analysis

¶ 78    As Watkins concedes on appeal, the statements demonstrated that Watkins responded to police questioning with nonsensical, rambling, and illogical statements.  These statements were relevant circumstantial evidence of Watkins' potential intoxication.  *See* § 42-4-1301(1)(f), (1)(g).  Undoubtedly the statements were prejudicial to Watkins, but they were not so prejudicial that the jury would have based its decision on improper considerations, nor did the risk of prejudice substantially outweigh their relevance.  *See Greenlee*, 200 P.3d at 367; CRE 403.  The court did not abuse its discretion by admitting the challenged footage.  *See Cordova*, 293 P.3d at 118; *see also Perez*, ¶ 22.

## D.    The Prosecution's Closing Argument

¶ 79    Next, Watkins argues that the prosecution lowered its burden of proof during closing arguments.  Specifically, Watkins challenges the prosecution's comments during rebuttal closing argument that the jury must "look at the pieces of evidence and see what they point to.  And if they point to guilty — if in a totality they point to her guilt, then you must find the defendant guilty."  The prosecution responds that, viewed in context, the isolated

42

comments simply asked the jury to consider the totality of the evidence, which is proper; and even if error occurred, it was harmless.

### 1. Standard of Review and Applicable Law

¶ 80 It is improper for a prosecutor to make comments that may potentially lower the burden of proof or misstate the law. *See Cuellar*, ¶¶ 66-69. "In a claim of prosecutorial misconduct, the reviewing court engages in a two-step analysis. First, it must determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010) (citation omitted). Each of these steps is "analytically independent" of the other, potentially allowing a prosecutor's comments to be improper but also harmless. *Id.*

¶ 81 "We must evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury." *People v. McMinn*, 2013 COA 94, ¶ 60. And "[i]n doing so, we recognize that prosecutors have wide latitude in the language and style they choose to employ, . . . [so] reviewing courts accord

prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *Id.* (citation omitted).

¶ 82    Because Watkins preserved this argument by contemporaneously objecting to the statements implicating the burden of proof, we review Watkins' claim of prosecutorial misconduct for constitutional "harmless error, which requires reversal if there is a reasonable probability that any error by the trial court contributed to the defendant's conviction." *People v. Duncan*, 2023 COA 122, ¶ 34; *see also Cuellar*, ¶ 62; *Hagos*, ¶ 11.

## 2.    Analysis

¶ 83    The challenged comments were made early in the prosecution's rebuttal closing argument.  The prosecution argued,

> When you get back to the jury deliberation room, if you have different details you are focused on, different perspectives, perfect. Great.  Compare.  That's the point of having a jury with different life experiences and different perspectives and observations.
>
> And I want to point out that no single piece of evidence proves this case.  It couldn't, right? There's more than one element to each of these charges.
>
> So what you have to do is look at the pieces of evidence and see what they point to.  And if they point to guilty — if in a totality they point

to her guilt, then you must find the defendant guilty. If we've proven it beyond a reasonable doubt —

Watkins objected but was overruled. The prosecution continued,

Beyond a reasonable doubt. And the defense points out correctly the burden is on the prosecution, on the People to prove this case. . . .

Well, let's look at the evidence. You cannot speculate. We talked about those pieces of evidence pointing to the result. If you have a piece of evidence, and . . . if there's not a piece of evidence, if you're guessing, if you're wondering, if you're speculating, oh, what if? What if that said something else? That does not apply in your role as a juror. So apply the evidence that is in front of you.

Watkins contends the prosecutor's assertion that if the evidence "point[s] to guilty — if in a totality [it] point[s] to her guilt, then you must find the defendant guilty" was improper.

¶ 84    While these statements, in isolation, do not properly represent the prosecution's burden of proof, when viewed in context and considering the totality of the arguments, they did not lower the prosecution's burden of proof. *See Wend,* 235 P.3d at 1096; *see also McMinn,* ¶ 60.

¶ 85    The prosecution pointed out that it had to prove the case "[b]eyond a reasonable doubt" and added that "[as] the defense points out correctly the burden is . . . on the People to prove this case." And the prosecution emphasized the proper burden of proof repeatedly throughout closing arguments. For example, at the start of closing argument the prosecutor stated, "The Judge just instructed you on the elements of the offense. And these are the things that the People have to prove beyond a reasonable doubt. Nothing less, but also nothing more." And at the end of closing the prosecution reiterated, "The People have to prove this case beyond a reasonable doubt and we have done that. A reasonable doubt is doubt based on reason. It is not vague, speculative, or imaginary. It is not beyond all doubt." As a result, even if the challenged comments were inartful, these isolated "pointing" comments do not demonstrate that the prosecution lowered its burden of proof. *See Wend*, 235 P.3d at 1096; *see also McMinn*, ¶ 60; *People v. Carter*, 2015 COA 24M-2, ¶ 60.

¶ 86    Furthermore, the court properly instructed the jury on the correct burden of proof. The jury's instructions provided, in relevant part,

46

The burden of proof is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt the existence of all of the elements necessary to constitute the crime charged.

Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.

The court also explained, "It is my job to decide what rules of law apply to the case. While the attorneys may comment on some of these rules, you must follow the instructions I give you." "Absent evidence to suggest otherwise, we presume that the jury followed these instructions." *Carter*, ¶ 59.

¶ 87 Considering the court's proper instructions on the prosecution's burden of proof, and the isolated nature of the prosecution's comments when viewed in context, the comments did not lower the prosecution's burden of proof. *See Carter*, ¶¶ 59-60; *see also Wend*, 235 P.3d at 1096; *McMinn*, ¶ 60.

## E.  Cumulative Error

¶ 88     Finally, Watkins contends that even if the individual errors alleged above do not warrant reversal individually, in the aggregate they deprived her of a fair trial and merit reversal.  The prosecution responds that cumulative error did not occur.

¶ 89     Cumulative error may warrant reversal "when 'the cumulative effect of [multiple] errors and defects substantially affected the fairness of the trial proceedings and the integrity of the fact-finding process.'"  *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (alteration in original) (citation omitted).  To reach this conclusion, we "must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not."  *Id.* at ¶ 25.

¶ 90     We have concluded for all of Watkins' claims raised on appeal that the district court did not err, or that any assumed error was harmless.  And the assumed errors, considered together, did not substantially affect the fairness or integrity of Watkins' trial to the point that reversal is warranted.  *See id.* ("Stated simply, cumulative error involves cumulative prejudice.").

### III. Disposition

We affirm Watkins' DWAI and child abuse convictions.

JUDGE HARRIS and JUDGE BERNARD concur.